UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUSSELL HUBBLE, as Personal
Representative of the Estate of
JENNIFER LYNN MEYERS,
Deceased,                                    Case No. 2:16-cv-13504

            Plaintiff,                       Paul D. Borman
v.                                           United States District Judge

                                             David R. Grand
COUNTY OF MACOMB,                            United States Magistrate Judge
*et al*,

            Defendants.
_____/

## OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 77 and 82), and (2) DENYING PLAINTIFF'S MOTION FOR SANCTIONS (ECF NO. 102)

This action involves the tragic death of Jennifer Meyers, a 37-year-old woman

who died as a result of acute sepsis while serving a thirty-day sentence at the Macomb

County Jail. Her Estate has filed suit against Macomb County, the Macomb County

Sheriff Anthony Wickersham (collectively "the Macomb County Defendants"),

Correct Care Solutions, LLC ("CCS"), the health care provider for the jail, and several

CCS staff.[1] The Complaint alleges that the Defendants caused Ms. Meyers's death by

_____

[1] Although Plaintiff's Complaint also names "Deputy John/Jane Does," the Estate has
not named any deputies or corrections officers in this litigation and does not sue any

1

being deliberately indifferent to her medical needs and thus violating her rights under the Eighth Amendment to be free from cruel and unusual punishment.

Both the Macomb County Defendants (ECF No. 82) and the CCS Defendants (ECF No. 77) have filed motions for summary judgment. In addition, the CCS Defendants have filed a motion to exclude the testimony of one of Plaintiff's experts, Dr. L.J. Dragovic (ECF No. 81), which is addressed in a separate Opinion and Order entered this same day. In addition, Plaintiff has filed a motion for sanctions directed to the CCS Defendants' failure to produce legible copies of certain health care records. (ECF No. 102).

The Court held three separate hearings on the various motions on January 10, 18, and 24, 2019. For the reasons that follow, the Court GRANTS the Defendants' motions for summary judgment and DENIES the Plaintiff's motion for sanctions.

## I. FACTUAL BACKGROUND

The facts, and all reasonable inference from those facts, are presented here in the light most favorable to the Plaintiff, as required on summary judgment.

### A. Ms. Meyers's Booking, Sentencing, and Housing in B-Pod

On the evening of June 25, 2013, at about 7:30 p.m., Ms. Meyers was brought to the Macomb County Jail by Macomb County Sheriffs, having been arrested on

---

jail corrections officers in their individual or official capacities.

outstanding warrants for a probation violation, Friend of the Court disorderly non-support, controlled substance possession, retail fraud, and two outstanding Detroit traffic citations. This was Ms. Meyers twelfth incarceration at the Macomb County Jail. (ECF No. 93-4, PgID 3131, Pl.'s Resp. to County Mot. Ex. 3, Office of Professional Standards Death Investigation Summary ("OPS Report"); ECF No. 82-2, PgID 2067, County Defs.' Mot. Ex. 1, Inmate Classification Notice). On her arrival at the jail on the evening of June 25, 2013, Ms. Meyers was pat searched by Correction Deputy Jennifer Bancroft who completed Ms. Meyers's initial classification/temporary assignment form. (OPS Report, PgID 3132.) Deputy Bancroft noted that Myers responded "no" to questions regarding suicidal risk and "no" to the question of needing immediate medical assistance. (*Id*.)

Following her initial classification, Ms. Meyers was placed into Holding Cell 11 where she remained until approximately 9:00 p.m., when she was taken for medical screening, which was performed by CCS Nurse Bayly. (*Id*. PgID 3133; ECF No. 90-22, Pl.'s Resp. to CCS Mot. Ex. 21, Receiving Screening Form, PgID 2834-39.) Bayly's E-signed receiving medical screening form noted that Ms. Meyers had Chronic Hepatitis C and Bipolar disorder, and also noted that Ms. Meyers had been hospitalized two months prior to her incarceration for an infection/abscess to her right arm, that Ms. Meyers was an IV heroin user and had last used one month earlier, had

been treated for substance/alcohol abuse in 2008/2009, and had a history of withdrawal after stopping alcohol and drugs, specifically nausea, sweats, and shakes after stopping opiates. (*Id.*) Nurse Bayly indicated that Ms. Meyers had previously taken a number of psychotropic medications but was currently not taking any medications. (*Id.*) Nurse Bayly noted that Plaintiff reported that she had been tested for pregnancy two days earlier and the results were "negative per hospital report per pt." (*Id.*) Otherwise, Nurse Bayly noted that Ms. Meyers was in no distress, had vitals within the normal range (blood pressure 90/70, pulse 100, respiration 18, temperature 96.10, pulse ox 98, weight 210 and BMI 31), was not sweating, anxious, or disheveled in appearance, had no obvious physical abnormalities, and was alert and oriented. (*Id.*) Ms. Meyers electronically signed the medical screening form, attesting that she had given full answers to the questions and that she had received information on how to obtain/access medical services during her incarceration and consenting to treatment by CCS. Nurse Bayly also ordered that Ms. Meyers be placed in general population housing with a bottom bunk restriction due to complaints of back pain. (*Id.* at PgID 2838; ECF No. 82-4, PgID 2073, June 26, 2013 Memo to Jail Command). Ms. Meyers was returned to Holding Cell 11 at approximately 3:00 a.m. following her medical screening. (OPS Report PgID 3133.) Later that morning, June 26, 2013, at 8:30 a.m., Ms. Meyers was arraigned on the non-support warrant and sentenced to

serve a thirty (30) days in the Macomb County Jail. She was booked and placed in Holding Cell 13 until later that afternoon when she was moved to "D Block," where she was housed in a common area with anywhere from 10-12 other inmates until June 29, 2013, when she was moved to Floor 6/7 and assigned to cell 6B3, the cell where she was housed until her death on July 7, 2013. (*Id*. PgID 3134; ECF No. 82-6, Sept. 8, 2017 Deposition of Jessica DeHate 79-80, PgID 216).

From the time that Ms. Meyers was placed into 6B3 on June 29, 2013, until the date of her death on July 7, 2013, there were no reports written by jail staff relating to Ms. Meyers and only one sick call request from Ms. Meyers, received on Friday, June 28, 2013, indicating that she was having severe back pain and needed medical attention. (ECF No. 99, CCS Defs.' Supp. Ex. P, Affidavit of Lara Ianitelli, R.N., H.S.A. Ex. A, Sick Call Logs June 26, 2013 through July 16, 2013.)[2] As discussed

---

[2] Plaintiff filed an Objection to Nurse Ianitelli's Supplemental Affidavit, arguing that (1) the Affidavit should have been submitted with CCS's motion for summary judgment, (2) Nurse Ianitelli is not on CCS's witness list, and (3) it is unclear when Nurse Ianitelli worked for CCS. (ECF No. 100, Objection to Supplemental Ex. P.) The Court finds that Ms. Ianitelli, as the keeper of the CCS records, is listed on CCS's witness list and may testify to the content of the CCS business records and need not be individually named on the Defendants' witness list. The Ianitelli Affidavit merely confirms what each CCS witness has stated – that only one medical kite was *received* by healthcare during the entirety of Ms. Meyers's incarceration. That CCS would rely on this fact was already known to the Plaintiff through the testimony of the CCS witnesses so Plaintiff cannot claim surprise at the affirming Affidavit of Nurse Ianitelli. Plaintiff has presented evidence, i.e. the statements of fellow inmates, that allegedly several medical kites were submitted, either by Ms. Meyers or by others on

in greater depth *infra*, CCS responded to that sick call request on Tuesday, July 2, 2013, when Ms. Meyers was seen by CCS medical staff and was given Tylenol and advised to apply heat to her back in the shower and instructed to "kite" (file another medical care request) again if pain persists. (OPS Report PgID 3134.) During this nine-day period, accounts of what transpired begin to diverge. Plaintiff's claims against Macomb County focus on the conduct of two corrections officers, Jessica DeHate and Kimberly (Hummel) Hill, and on the conduct of Sheriff Wickersham, both in his individual supervisory role and in his official capacity role as the person responsible for the policies and customs of the Macomb County Jail. While Plaintiff has not named officers DeHate and Hill as Defendants in this action, and does not intend to proceed against them individually, she relies on their alleged misconduct as

———————————

her behalf, related to Ms. Meyers's condition. That evidence however, fails to create a genuine issue of material fact as to the number of kites *received* by healthcare related to Ms. Meyers because there is no evidence in the record to substantiate (1) when those kites allegedly were sent (whether before or after Ms. Meyers was seen by CCS on July 2, 2013); (2) how those kites allegedly were sent; or (3) to whom on the CCS and jail staff they allegedly were given. Plaintiff's expert Margo L. Frasier relies on this evidence in forming her opinion that Defendants were deliberately indifferent to Ms. Meyers's serious medical need. But Ms. Frasier admitted that she did not know who submitted the kites, whether they were submitted before or after Ms. Meyers was seen by Nurse Jones on July 2, 2013, or who on the jail or CCS staff actually received and failed to pass on these kites. (ECF No. 96-2, June 25, 2018 Deposition of Margo L. Frasier 36:21-38:10.) The Court will allow the submission of the Ianitelli Affidavit which confirms that CCS *received* only one kite related to Ms. Meyers during her incarceration.

a basis for her Eighth Amendment claims against the County and Sheriff Wickersham, as discussed *infra*.

Officer Hill testified that her duties included making rounds on the inmates in Ms. Meyers's Pod (6B) once every hour, which involved looking into each individual cell to make sure the inmates are safe and secure. (County Defs.' Mot., ECF No. 82-5, Sept. 1, 2017 Deposition of Kimberly Hill 13-16, PgID 2088-91.) Officer Hill does her visual inspection, makes sure that the inmates are safe and secure and that none of them have questions for her or any kites to give her, before moving on to the next unit. (Hill Dep. 19, PgID 2094.) If an inmate is sleeping, Officer Hill makes sure they are breathing and makes them aware that she is there so that if they have questions or kites, they can approach her. (*Id.* at 51, PgID 2126.) Officer Hill made rounds on Pod 6B approximately 33 times between June 29, 2013 and July 7, 2013, but has no recollection of Ms. Meyers ever complaining about any pain, or any issues relating to her medical condition during the ten days that she was there in 6B. Officer Hill testified that there was not a single time that Ms. Meyers came to Hill and talked to her directly. Officer Hill had no recollection at all of Ms. Meyers's physical condition – nothing stood out in her mind. (*Id.* at 15, 20-21, PgID 2090, 2095-96.) Ms. Hill recalled seeing Ms. Meyers, she just did not remember Ms. Meyers ever saying anything to her about her medical condition. (*Id.* at 27-28, PgID 2102-03.)

Ms. Hill testified that usually if she notices that an inmate has been in their cell for some period of time, she would question it and would make sure the inmate was getting food trays and physically eating their food – but she did not remember one way or the other if this was happening with Ms. Meyers. Nor did Ms. Hill recall any type of odor emanating from Ms. Meyers or her cell or being told by other inmates that Ms. Meyers was in pain or that she smelled – she would have remembered if that had happened. (*Id*. at 28-31, PgID 2103-06.)

The day of Ms. Meyers' death, Hill recalled that several inmates came up to her and Officer DeHate while they were in the process of feeding the inmates, and told them that they needed to check on Ms. Meyers. So Officers Hill and DeHate immediately went to Ms. Meyers's cell and found Ms. Meyers "hunched over in her [property] bin." (*Id*. at 10, PgID 2085.) Officer DeHate began chest compressions and Officer Hill called medical and stood watch over the other inmates. Officer Hill could not tell if Ms. Meyers was breathing or if her face was blue but she did not touch Ms. Meyers. (*Id*. at 34-36, 53, PgID 2109-11, 2128.) Officer Hill was surprised to learn that Meyers had died because she had never noticed and was never alerted to any medical concerns with Ms. Meyers, Hill was never approached by any inmates about Meyers's medical condition and if she had been she would have approached Meyers herself to talk to her and called medical. (*Id*. at 37, 42, 44, 53, PgID 2112,

2117, 2119, 2128.) Officer Hill testified that typically the nurses collect the medical kites when they come to the floor each day to pass out medications, but if an inmate tries to give Officer Hill a medical kite, she asks the inmate if its urgent and checks to see if the inmate appears to be well, and if the inmate states that it is urgent, Officer Hill calls a nurse right away. (*Id*. at 43, PgID 2118.) If she had been approached by other inmates trying to hand her kites for Ms. Meyers, and telling her that medical was not accepting Ms. Meyers's kites, Hill would have gone straight to the command officer to report this because accepting kites is part of CCS's job. (*Id*. at 45, PgID 2120.)

Officer DeHate recalled one conversation that she had with Ms. Meyers on 6B in which Ms. Meyers said she had back pain and Officer DeHate asked if she had kited medical to which Ms. Meyers responded "yes," and Officer DeHate suggested Ms. Meyers take a hot shower to help relieve the pain. (DeHate Dep. 21, PgID 2150.) Other than that interaction, Officer DeHate had no reason to believe that Ms. Meyers was in pain or was suffering with medical complications and was unaware of any other Officers who knew of complaints about Ms. Meyers's medical condition, nor was she aware of a smell so strong coming from Ms. Meyers's cell that you could smell it when you walked into the Pod. (*Id*. at 21-22, PgID 2150.) In fact, on the day of Ms. Meyers's death, at 4:10 p.m., just about an hour before inmates called Officers

Hill and DeHate to Ms. Meyers's cell, Officer Hill had rounded on Ms. Meyers's cell and observed Ms. Meyers sitting on the edge of her bed looking down at the floor and appearing to be fine. (*Id*. at 32, 34-35, PgID 2152-54.) In a statement that Officer DeHate prepared just after the incident, Office DeHate stated that on Saturday, Ms. Meyers had another inmate grab her dinner because her back was hurting. Officer DeHate did not recall that at the time of her deposition. (*Id*. at 33, PgID 2153.) Officer DeHate testified that she is trained in CPR and other measures solely for purposes of first response. Officer DeHate first tried a sternum rub on Ms. Meyers which elicited no response and then proceeded with CPR, which she continued until medical arrived in less than five minutes and Medstar arrived approximately five minutes after medical. (*Id*. at 38-42, PgID 2154-55.) Officer DeHate never had another conversation with Ms. Meyers about her medical condition, does not recall Ms. Meyers ever looking like she was sweating profusely, and never heard from anyone else that Ms. Meyers was having physical problems. (*Id*. at 46-47, PgID 2156.) Officer DeHate testified, as did Officer Hill, that they are not typically supposed to accept medical kites, and if an inmate tries to hand her one she asks if it is a medical emergency, asks if the inmate needs to see a doctor right away, and if they say no she looks at them carefully to see if they are fine or if they are just lying and if they look fine she gives them back the kite and tells them to give it to the nurse

when she comes up for rounds.  (*Id*. at 57-59, PgID 2159.)  Officer DeHate was not aware of any medical kites that other inmates were trying to submit for Ms. Meyers, she was never told by other inmates that Ms. Meyers had been in bed all week and was sick and sweaty and needed medical attention.  (*Id*. at 61-62, 94-95PgID 2160, 2168.)  Officer DeHate did recall that an inmate had approached her and told her that Ms. Meyers smelled badly and so when Officer DeHate had the one conversation with Ms. Meyers when Ms. Meyers complained of her back pain, Officer DeHate took the opportunity the suggest that Ms. Meyers take a hot shower.  (*Id*. at 65, PgID 2161.)  Officer DeHate did not recall Ms. Meyers ever having been seen by medical or taking her down to medical.  (*Id*. at 72, PgID 2162.)

In contrast to what Officers Hill and DeHate observed about Ms. Meyers's medical condition during her ten days on Pod 6B, several inmates who prepared statements at the time of Ms. Meyers death, and subsequently provided Affidavits in support of this litigation, suggest a very different picture of a woman who was suffering terribly (and visibly) and whose pleas for help were being ignored by both jail staff and CCS staff.  Fellow inmate Rettia Macleod submitted an Affidavit stating that she had been housed with Ms. Meyers both in the D Block and on the 6B Pod. (ECF No. 93-5, Pl.'s County Resp. Ex. 4, Aug. 14, 2017 Affidavit of Rettia Jane Macleod PgID 3142.)  Ms. Macleod states that during the entire time she was housed

with Ms. Meyers, she watched Ms. Meyers suffering severe body aches and pains while lying on a thin pad in D Block and on her bunk in B Pod. Many inmates helped Ms. Meyers to shift on her bed to help her be more comfortable and lessen her pain. Ms. Macleod states that "many inmates" prepared kites for medical attention for Ms. Meyers while in B Pod and believes that the guards "must have known what condition" Ms. Meyers was in "because she could not get out of bed." (*Id*. Pgid 3143.) Ms. Macleod noticed Ms. Meyers sweating "a lot," and smelling "like her flesh was rotting." Ms. Macleod knew Ms. Meyers was suffering and needed immediate medical help. Yet corrections officers were doing nothing to help Ms. Meyers, "no matter how many times we wrote and handed in medical kites for her," and "nurses on rounds refused to examine Ms. Meyers even though they asked them to do so." (*Id*. PgId 3143.) Ms. Macleod recalled the name of Officer DeHate and testified that DeHate saw Ms. Meyers's condition and when Ms. Macleod asked DeHate to help Ms. Meyers, Officer DeHate responded that Ms. Meyers "was used to detoxing." (*Id*. PgID 3143-44.) Ms. Macleod states that she is prepared to testify to the statements in her Affidavit. (*Id*. at 3144.) Ms. Macleod prepared a second Affidavit on September 22, 2017, adding that after she reviewed the names of the guards from the jail records provided to her by Plaintiff's attorney, she specifically recalled that Officer Franks, DeHate and Hummel (Hill) were frequently in B Pod

during Ms. Meyers's incarceration and were told by her and many other inmates on the pod that Ms. Meyers needed immediate medical care. (ECF No. 93-6, Sept. 22, 2017 Affidavit of Rettia Jane Macleod, PgID 3148-49.)

Fellow inmate Amy Sue Pregizer submitted an Affidavit stating that she was housed a few doors down from Ms. Meyers on B Pod. (ECF No. 93-7, Aug. 20, 2017 Affidavit of Amy Sue Pregizer PgID 3152-3155.) Ms. Pregizer testified that Ms. Meyers need for medical attention was dire and obvious as she was sweating constantly, "like she just go out of the shower," could barely move from her bunk and was having trouble breathing. (*Id*. PgID 3152.) Ms. Pregizer states that the smell coming from Ms. Meyers's cell was "was so bad that anyone taking a step into the unit could smell the smell." Ms. Pregizer recites that several inmates complained about the smell to the guards and nurses but no one ever attempted to help Ms. Meyers. Ms. Pregizer states that the "the guards were aware of Ms. Meyers's need for medical care because we brought our concerns to the guards and nurses by telling them about Ms. Meyers and writing numerous medical kites/medical requests" and giving them "to the guards and nurses." (*Id*. PgID 3153.) Ms. Pregizer testifies that she "knew for a fact that Deputy DeHate knew about the terrible smell coming from Ms. Meyers" because DeHate told inmates to shower, directing the comments to Ms. Meyers. (*Id*.) Ms. Pregizer testifies that the "guards knew the terrible condition Ms.

Meyers was in, because the guards allowed [her] and other inmates to get many of her meals for her because she could not get out of her bunk." (*Id*. PgID 3154.)

Fellow inmate Carrie Shaw provides an Affidavit testifying that she was housed in B Pod on the floor just above Ms. Meyers and saw Ms. Meyers at least a few times every day for about one week prior to her death. (ECF No. 93-8, March 15, 2018 Affidavit of Carrie R. Shaw PgID 3157-60.) Ms. Shaw testifies that she knew Ms. Meyers from previous incarcerations and that she knew as soon as she saw Ms. Meyers that there was something wrong with her. Ms. Meyers asked Ms. Shaw to help make her bed because of her back pain, and Ms. Shaw noticed that Ms. Meyers was sweating a lot and that she smelled badly "even after she showered." (*Id*. PgID 3158.) Ms. Shaw testifies that several inmates informed correctional staff, including DeHate, that Ms. Meyers could not get up to get her food and the officers allowed other inmates to take Ms. Meyers food trays to her in her cell. Ms. Shaw testified that corrections officers rarely spent more than a few seconds looking into inmates' cells during rounds and that even though officers, including DeHate, knew that Ms. Meyers was unable to leave her cell for days, they did not enter her cell to make an honest attempt to check on her until the day she died. (*Id*. PgID 3159.) Ms. Shaw testified that Ms. Meyers told her that Ms. Meyers had kited medical at least four times and when Ms. Shaw asked DeHate when Ms. Meyers was going to get medical attention,

DeHate said "medical knew about" Ms. Meyers.  (*Id.*)[3]

---

[3] Defendants continue to refer to the inmate testimony generally as "hearsay," but it is clear that the inmate's sworn affidavits, which largely present the personal observations of these fellow inmates, to the extent they are based on personal knowledge of the inmate, are competent summary judgment evidence.  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(d). The Sixth Circuit routinely considers such sworn fellow inmate testimony. *See, e.g. Winkler v. Madison County*, 893 F.3d 877, 887 (6th Cir. 2018) (noting the testimony of an inmate that the deceased "was kind of weak" and "didn't feel good" and that he "told [the deceased] it was dope or ulcers something" that was killing him and he "[b]etter do something"); *Kindl v. City of Berkley*, 798 F.3d 391, 400 (6th Cir. 2015) (considering fellow detainees' statements regarding what they heard and saw of the deceased who was going through delerium tremens); *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 536 (6th Cir. 2008) (considering testimony of inmate who stated that the examining doctor "just glanced at [plaintiff] and prescribed some pill" and "failed to even to touch her"); *Miller v. Calhoun County*, 408 F.3d 803, 809 (6th Cir. 2005) (noting that cell mate reported that deceased "complained of a headache to the guard and requested an aspirin," three different times); *Speers v. County of Berrien*, 196 F. App'x 390, 396 (6th Cir. 2006) (finding issue of material fact of officer's subjective knowledge based on fellow inmate's testimony that he alerted guards that deceased "had foam in his mouth" and "was twitching" and had "collapsed," finding guards should at least have contacted medical personnel or at least tried to speak to the deceased or to enter his cell and check on him); *Hamilton v. Pike County, Ky.*, No. 11-99, 2013 WL 529936, at *1 (E.D. Ky. Feb. 11, 2013) (Thapar, J.) (relying on testimony of a fellow inmate as to what he observed, what he said to nurses, and to his belief that the nurses were aware of Hamilton's condition).

Plaintiff also relies on several unsworn fellow inmate "statements" that were written by the inmates at the direction of jail staff in the hours just after the discovery that Ms. Meyers had passed.  Affiant Pregizer explains that "the guards closed our cell doors on B Pod and slid witness statements and pencils under our doors and told us to write what we recalled about Jennifer before her death and when she was discovered in her cell."  (Pregizer Aff. PgID 3154.)  Unsworn statements are inadmissible and typically cannot create a genuine issue of material fact on summary judgment.  "[U]nsworn statements . . . offered by defendants must be disregarded

### B.    Ms. Meyers's Medical Evaluations by CCS Staff

The evidence establishes that Ms. Meyers sent a kite to medical, marked "Urgent," on Friday, June 28, 2013. (ECF No. 93-18, Pl.'s County Resp. Ex. 17, Kite, PgID 3180.)  The kite form provides three boxes for rating the degree of medical need: Routine, Urgent, and Emergent.  Ms. Meyers selected "Urgent" suggesting that her need was not routine but also was not an emergency.  Ms. Meyers was seen on Tuesday, July 2, 2013, in response to that kite.  (*Id*.)  From the time that Ms. Meyers was placed into 6B3 on June 29, 2013, until the date of her death on July 7, 2013, there is only one sick call request from Ms. Meyers, received on June 28, 2013, indicating that she was having back pain and needed medical attention. (ECF No. 99, Ianitelli Aff., Ex. A, Sick Call Logs June 26, 2013 through July 16, 2013, PgID 3679.)  CCS responded to that sick call request on July 2, 2013, when Ms. Meyers was seen by CCS medical staff and was given Tylenol and advised to apply heat to her back in

---

because a court may not consider unsworn statements when ruling on a motion for summary judgment." *Dole v. Elliott Travel & Tours*, 942 F.2d 962, 968-69 (6th Cir. 1991) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17 (1970)).  *See also Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 N. 1 ("'[A] court may not consider unsworn statements when ruling on a motion for summary judgment.'") (quoting *Dole*, 942 F.2d at 968-69 n. 1).  The Plaintiff has not responded with a specific hearsay argument with respect to these unsworn witness statements and the Court will not consider them in its summary judgment analysis.  The Court notes, however, that their content is largely reiterated in the sworn inmate statements which *are* being considered at this summary judgment stage.

the shower and instructed to "kite" (file another medical care request) again if pain persists. (OPS Report PgID 3134.) The nurse who responded to that kite, Stephanie (Noland) Jones, testified that she had no independent recall at the time of her deposition in July, 2017, of the one occasion that she saw Ms. Meyers. (ECF No. 90-20, Pl.'s CCS Resp. Ex. 19, July 12, 2017 Deposition of Stephanie (Noland) Jones 11, PgID 2813.) Nurse Jones testified that the only way she would be able to recall her care of Ms. Meyers would be to review the records that she prepared at the time she saw Ms. Meyers. (*Id*.) At the time that Nurse Jones saw Ms. Meyers, she was a Licensed Practical Nurse ("LPN"), having received her degree in 2010 and becoming licensed as an LPN in the State of Michigan. (*Id*. at 5, PgID 2812.) At that time, Nurse Jones had also received training and her degree to become licensed as a Registered Nurse ("RN"), but had not yet received her Michigan license to practice as an RN. (*Id*. at 9-10, PgID 2813.) LPNs are authorized to dispense oral medications, but not intravenous medications, and cannot independently diagnose or prescribe medications. (*Id*. at 6, PgID 2812.) As an LPN, Nurse Jones would pass medications from the med cart, pick up kites from inmates, triage patients on the intake process (do medical screening at booking), and take sick call, i.e. see patients who submitted kites. (*Id*. at 6-8, PgID 2812.)

Nurse Jones resigned from her job with CCS in the summer/fall of 2014 and began working for an urgent care center. (*Id.* at 8, PgID 2812.) Nurse Jones had no recollection of Ms. Meyers at all, and when shown a picture of Ms. Meyers did not recall ever having seen her face. (*Id.* at 13-15, PgID 2814.) Nurse Jones did not learn of Ms. Meyers death until she received the notice for her deposition in this case in 2017. Although Nurse Jones was still on staff at CCS for almost a year after Ms. Meyers passed away, she never learned of her death. (*Id.*) From a review of the medical records that bore her signature, Nurse Jones stated that medical received only one kite from Ms. Meyers dated June 28, 2013, and that Nurse Jones saw her in response to that kite on July 2, 2013. (*Id.* at 23-25, PgID 2816-17; ECF No. 90-19, Pl.'s CCS Resp. Ex. 18, Correct Care Solutions Sick Call Request "Kite," PgID 2808.) In reviewing the June 28, 2013 Kite that both Nurse Jones and Ms. Meyers signed, Nurse Jones did not know what the "X" placed next to the word "Urgent," one of three choices – Emergent, Urgent, Routine – meant. (Jones Dep. 24-25, PgID 2817.) From reviewing her records Nurse Jones recalled that Ms. Meyers stated that her pain started nine days ago and that she had an MRI two days before coming to jail. (*Id.* at 27, PgID 2817; ECF No. 90-21, PgID ID 2830, 7/2/13 "Muscular Aches" Note for Jennifer Meyers.) The 7/2/13 Note contains a number of questions or inquiries that Nurse Jones was required to ask or actions that she was required to take to examine

and assess Ms. Meyers. Nurse Jones's 7/2/13 Note further reflects that Ms. Meyers stated that the pain was in her lumbar area, that she did not know what she had done to injure her back, and Ms. Meyers "denied any exacerbating or relieving factors." (*Id.*) Although Nurse Jones frequently reiterated in her deposition that she had no independent recollection of seeing or treating Ms. Meyers, Nurse Jones testified that based on her standard practice in taking medical records, she believed that the medical record was accurate. (Jones Dep. 32, PgID 2818.) Nurse Jones testified that she would have accurately written down what she found on her examination of Ms. Meyers. (*Id.* at 34, PgID 2819.)

Nurse Jones's 7/2/13 Note states that Ms. Meyers's vital signs were all normal: pulse was 60 (within the normal range of 60-100), that her respiration was 16 (within a normal range of 12-20), that her blood pressure was 120/72 (within normal limits). (*Id.* at 32-33, PgID 2818-19; 7/2/13 Note, PgID 2830-32.) Nurse Jones's 7/2/13 Note reflects that she inspected Ms. Meyers's back, and Ms. Meyers was able to move through an entire range of motion of her back, which would mean bending over and straightening up. The 7/2/13 Note further reflects that Nurse Jones's examination revealed no bruising, swelling, redness, or heat to the touch. (*Id.* at 35-36, PgID 2819; 7/2/13 Notes at 1, PgID 2830.) Nurse Jones testified that although the 7/2/13 Note did not state Ms. Meyers's temperature, her standard practice and procedure would have

been to take the temperature as part of the vital signs and the absence of a note regarding temperature was an indication that Ms. Meyers's temperature was not elevated. (Jones Dep. 57-60, PgID 2825.) Nurse Jones also testified that her standard practice and procedure when informed by an inmate of a previous outpatient test or study would be to ask where it was performed and the absence of a notation as to where Ms. Meyers had her MRI performed would mean that Ms. Meyers did not disclose that information to Nurse Jones. (Jones Dep. 57, PgID 2825.)

As a result of the information gained through this examination, Nurse Jones assessed Ms. Meyers as "alteration in comfort, nonspecific." (Jones Dep. at 36, PgID 2819; 7/2/13 Notes at 2, PgID 2831.) Nurse Jones explained that if there are no findings other than the patient's complaints of pain and minimal swelling in the area (and Nurse Jones found no swelling) without bony deformity, the protocol directs to "assess alteration in comfort, nonspecific." (Jones Dep. at 37, PgID 2820; 7/2/13 Notes at 2, PgID 2831.) Nurse Jones concluded that the appropriate intervention was for "muscle pain from unaccustomed activity or exertion." (Jones Dep. 39, PgID 2820; 7/2/13 Note 2831.) She advised rest for a few days and prescribed Tylenol 975 mg by mouth twice a day, indicated "if discomfort is severe." (*Id*.) Nurse Jones's 7/2/13 Note also indicates that she recommended applying "the RICE sequence," which prescribed rest, ice, compression, and elevation. (Jones Dep. 39-42; 7/2/13 Note

PgID 2831.)    The 7/2/13 Note finally states that Nurse Jones gave "975 mg per nursing pathway," and educated Ms. Meyers to apply heat to her back in the shower, and that "if needed [she] can always put another kite in for back pain."  (Jones Dep. 43-45; 7/2/13 Note, PgID 2832.)

CCS Nurse Karen (Creagh) Black was the Director of Nursing at CCS at the time of Ms. Meyers's death and was the supervisor who reviewed and E-signed both the Receiving Screening form completed by Nurse Bayly and the 7/2/13 Note prepared by Nurse Jones.  (ECF No. 90-23, Pl.'s CCS Resp. Ex. 22, Aug. 13, 2017 Deposition of Karen (Creagh) Black, RN PgID 2841.)  Nurse Black was first trained as an Emergency Medical Technician ("EMT"), later licensed by the State of Michigan as a paramedic, and became licensed as an RN in 2007.  (*Id*. at 7-10, PgID 2843-44.)  Nurse Black was hired to work at the jail (then  Correctional Medical Services "CMS" had the contract for the Macomb County Jail – CCS took over in 2011 ) in late summer of 2008 as a RN, and was promoted to Director of Nursing at CCS in 2011.  (*Id*. at 10-15, PgID 2844-45.)  CCS corporate office sent someone to train her one-on-one for the Director of Nursing position, and reviewed CCS policies and procedures with her, mainly the NCCHC protocols and guidelines.  (*Id*. at 15-16, PgID 2845.) During her time as Director of Nursing, all of her nurses were obligated to fulfill the obligations that existed in the NCCHC guidelines and she never

experienced a circumstance where that was not happening on a consistent basis. (*Id.* at 20, PgID 2846.) Nurse Black left her job with CCS in 2014. (*Id.* at 17, PgID 2846.)

She was aware of Ms. Meyers's passing and she participated in a postmortem review done by CCS following Ms. Meyers's death. (Black Dep. at 20-21, PgID 2846-47; ECF No. 26, Pl.'s Resp. Ex. 26, Mortality Review.) She was called and informed that an inmate had passed away and she was at the facility 30 minutes later. (Black Dep. 24, PgID 2847.) Nurse Black merely observed once she arrived and had nothing to do with transferring Ms. Meyers's body. (*Id.* at 27, PgID 2848.) Nurse Black participated in the mortality review related to Ms. Meyers's death but other than that she did not do any follow up to determine the cause of Ms. Meyers's death. (*Id.* at 37-38, PgID 2851.) The Mortality Review is a two-page document that consists of a number of fill-in-the-blank questions simply repeating some of what is contained in Ms. Meyers's jail medical records. (ECF No. 90-27, Pl.'s Resp. Ex. 26, PgID 2928.) The Mortality Review notes Ms. Meyers's past substance abuse of Heroin, her history of Hepatitis C, her Bipolar disorder, notes that she has no history of self-harm, had been hospitalized for rehabilitation from drug abuse in 2008-2009, and two months prior to incarceration had been hospitalized for an abscess on her arm. (*Id.*) The Mortality Review describes Ms. Meyers's mental state just prior to death as "sitting

in cell talking, had eaten lunch, no complaints." (*Id*.) Inmates confirmed that Plaintiff did come out of her cell to eat lunch on the day she passed. With regard to "potentially relevant precipitating factors," the review notes that she was not suicidal, and questioned whether her drug history was related to her death. (*Id*.) The review notes that there was an adequate up-to-date history and physical in the record, that she had received a mental health visit, that treatment given was consistent with the history given, and that follow-up was noted on the medical record. (*Id*.) The Mortality Review indicates that jail staff began CPR, medical placed an AED, and continued CPR until paramedics arrived. (*Id*.) The death was not attributed to a secondary diagnosis, appropriate care was noted as provided, all five individuals present for the Mortality Review agreed that there was "no way to see this coming and feel that all staff did the correct steps to save her." (*Id*.) The Mortality Review is signed by Dr. Marcella Clark, MD, Kim Gerdes, RN, HSA, Karen Black (Black), RN, DON, Dr. Rozel Elacesui (spelling not legible), MD, and Natatlie Pacitto, MA, LPC, C&P (*Id*.) It is signed by a clinical specialist, CCHP, whose name is not legible. (*Id*.)

Nurse Black as the supervising RN E-signed several of the medical records pertaining to Ms. Meyers, which meant that Nurse Black reviewed them for thoroughness and completeness – she verified that the document prepared by the nursing staff was completely filled out and all required information was provided.

(Black Dep. 50-51, PgID 2854.)   Nurse Black E-signed the Emergency Response Worksheet that was completed by the nursing staff who responded to Ms. Meyers's death in her cell at the jail which details the steps taken by jail and nursing staff in responding to Ms. Meyers's emergency and death.  (ECF No. 78, Sealed Macomb County Jail Records, PgID 1958; Black Dep. 42, PgID 2852.)  The nursing staff also completed a "Man Down Form" when they responded to Ms. Meyers emergency. (Black Dep. 96-97, PgID 2865; ECF No. 78, PgID 1960.)  Nurse Black E-signed the Medical Screening Form discussed *supra*.  (ECF No. 78, PgID 1969; Black Dep. 74-75, PgID 2860.)  Nurse Black also E-signed the "Muscular Aches" pathway form completed by Nurse Jones and discussed at length *supra*.  (ECF No. 78, PgID 1978.) Nurse Black explained that the Muscular Aches form is a standard nursing pathway utilized by CCS, a "SOAP" pathway – subjective, objective, assessment and plan – for the sick call nurse to follow when seeing a patient.  (Black Dep. 48-49, 60-61, PgID 2853-54, 2856-57.) The sick call nurse prepares an "assessment," not a diagnosis – and here Nurse Jones assessed "alteration in comfort nonspecific." (Black Dep. 64-65, PgID 2857-58.) Nurse Black confirmed that the medical records pertaining to Ms. Meyers contained only one kite and she explained that kites are "logged" when they are submitted but she had never seen the log that would indicate how many kites Ms. Meyers had submitted.  (Black Dep. 49-55, PgID 2854-56.)

Nurse Black explained that when a nurse picks up kite, she is instructed to look at it for any "emergent life-threatening issues that need to be addressed right away," put the kite in the med cart for privacy, and take it back to the medical unit where she logs the kites onto a sheet. (Black Dep. 54, PgID 2855.) Nurse Black explained that her understanding of the designation "urgent" on the kite form means that the inmate should be seen sooner rather than later. (Black Dep. 46-47, PgID 2853.) Nurse Black explained that the four-day wait that Ms. Meyers experienced between her June 28, 2013 kite and her July 2, 2013 appointment with the nurse could have been due to the fact that sick-call nurses are only staffed Monday through Friday and that if a nurse on Friday does not indicate an issue is emergent/life-threatening, it may not be seen until the following Monday. (Black Dep. 52-54, PgID 2854-55.)

Nurse Black testified that the nursing staff is trained to follow through if an inmate indicates that they have recently had an MRI exam (or presumably other diagnostic test). (Black Dep. 62-63, PgID 2857.) She testified that this is policy that they are trained to follow *if* the inmate indicates the location where they had the exam. (*Id*.) In this case, CCS was alerted to the fact that Ms. Meyers had an MRI two days prior to her arrest and they were aware that she had been in the hospital two days prior to her arrest because the records indicate that she had been "tested 2 days ago for pregnancy – negative per hospital report per pt." (Black Dep. 88-89, PgID 2863-64,

ECF No. 78, Medical Receiving Screening PgID 1965.) There was no specific information identifying the reason for the MRI.

Nurse Black explained her understanding of the condition of "acute sepsis" as an infection that came on suddenly. She testified that CCS does not provide training specific to "acute sepsis," but that many pathways and protocols are designed to detect infections, such as the muscular aches pathway employed in Ms. Meyers's case – if following that pathway had led to other objective findings, such as any abnormal vitals, then another pathway would be indicated. Nurse Black testified that the symptoms she would expect to see with an infection would be diarrhea, confusion, fever, chills, sweating (could be present), generalized aches and pains and fatigue, but not necessarily debilitating pain and not "a foul smell." (Black Dep. 112-117, PgID 2869-71.)

Significantly, Ms. Meyers was scheduled for a history and physical, which policy required to take place within 14 days of admission to the jail, and for a doctor's visit due to her chronic hepatitis, which was to occur per standard policy and as indicated on the intake forms within 30 days of admission to the jail. Of course, Ms. Meyers passed before the 14-day and 30-day appointments were scheduled to occur and there is no documentation in the records that those appointments were actually scheduled — they would have been automatically populated at the appropriate time,

according to Nurse Black. (ECF No. 78, Initial Mental Health Evaluation, PgID 1974-75; Intake Nursing Interventions – Hepatitis and/or Jaundice, PgID 1962; Screening and Receiving PgID 1968; Black Dep. 56-60, 83-84, 86-87, PgID 2855-56, 2862-63.)

Ms. Meyers was also referred on intake for a mental health screening, which occurred on July 3, 2013, the day after her appointment with Nurse Jones. (ECF No. 78, Initial Mental Health Evaluation PgID 1974.) Ms. Meyers was seen by Limited Licensed psychologist ("LLP") Chantalle Brock, who has a Bachelor of Arts from the University of Michigan, with a minor in women's studies, and a Master of Arts in clinical psychology from University of Detroit Mercy. (ECF No. 77-5, CCS Def.'s Mot. Ex. 5, July 14, 2017 Deposition of Chantalle Brock 8, PgID 1812.) Ms. Brock did not have an independent recollection of Ms. Meyers at the time of her deposition but was able to discuss her interaction with Ms. Meyers through a review of her records. (*Id.* at 9, PgID 1813.) Ms. Brock had nothing to do with Ms. Meyers's physical medical care and saw her on July 3, 2013, for an initial mental health evaluation. Ms. Brock noted Ms. Meyers had a history of having taken a number of prescription drugs, heroin use, denied suicide attempts, bipolar disorder, but no current medications. (Brock Dep. 16-18, PgID 1814-15; ECF No. 78, Mental Health Evaluation PgID 1975.) Ms. Brock noted Ms. Meyers as presenting "stable and appropriate" with "goal-directed thought processes," willing and able to engage with

her clearly and coherently. (*Id.* at 18, PgID 1815; ECF No. 78, PgID 1975.) Although Ms. Brock was not specifically addressing medical condition, her notation that she "presented appropriately" without further notation suggested that they had an appropriate interaction – her speech was clear and coherent, her mood was stable. (*Id.*) Ms. Brock's notes indicate that Ms. Meyers reported that she had last used heroin nine days ago. (*Id.* at 21-22, PgID 1816; ECF No. 78, PgID 1975.) Ms. Brock educated Ms. Meyers on how to kite for mental health and did not schedule her for follow up because Ms. Meyers was appropriate and oriented and stable and denied any need for mental health services. (Brock Dep. 29-32, PgID 1818; ECF No. 78, PgID 1975.)

## C. Sheriff Wickersham's Involvement, the Jail Administrator's Role and the Relevant Jail Policies and Procedures

Sheriff Anthony Wickersham testified that he has been the Sheriff of Macomb County continuously since January 1, 2011. (ECF No. 82-8, County Defs.' Mot. Ex. 7, Dec. 4, 2017 Deposition of Anthony M. Wickersham 6, PgID 2194.) It is undisputed that Sheriff Wickersham had no personal involvement with Ms. Meyers's and was unaware of her medical condition until after she had passed and her death was reported to him. Wickersham testified that he is the top policy maker for the Macomb County Sheriff's Office, he has full responsibility for the Macomb County Jail and that his jail administrator at the time of Ms. Meyers death, Michelle Sanborn, was the

28

policy maker to whom he delegated the authority to make policy for the jail, including overseeing the hiring and oversight of healthcare providers, including the contract with CCS that was in effect on the date of Ms. Meyers's death. (*Id*. at 9-11, 15, 24, 44-45, PgID 2195, 2196, 2198, 2203-04.) Ms. Sanborn does not have medical training but she oversees the contract with CCS and ensures that the services outlined in the contract are honored. (*Id*. at 45-46, PgID 2204.) There are approximately 1200 inmates in the jail on any given day and the jail processes between 17,000 and 19,000 inmates per year. (*Id*. at 17, PgID 2197.) Sheriff Wickersham spends less than one hour per week actually in the jail, although his office is in a building adjacent to the jail. (*Id*. at 23-24, PgID 2198.) Sheriff Wickersham has no personal involvement in the healthcare needs of inmates unless something is specifically brought to his attention. (*Id.* at 27-28m PgID 2199.)

Sheriff Wickersham was called and did arrive at the scene of Ms. Meyers's death on July 7, 2013. (*Id*. at 29, PgID 2200.) Sheriff Wickersham understood his constitutional duty was to provide inmates the healthcare that they need and to attend to those needs as requested. Inmates are given information on how to "kite" or request to be seen by medical when they are booked, which explains that forms for "kiting," or requesting to be seen by medical personnel, are available upon request and are generally to be given to the nursing staff on their rounds. However, if an inmate

is experiencing an emergency, they can contact the correctional staff and they will be taken care of immediately if the correctional staff or supervisor determines that the need is immediate. The correctional staff are not medical personnel but have emergency response medical training and are trained to determine whether an inmate is having pain or significant difficulty and if so, to reach out to the medical staff immediately. (*Id*. at 33-39, PgID 2201-02.) Sheriff Wickersham did not recall an instance when a violation of the policy regarding the process for submitting kites was brought to his attention. (*Id*. at 40, PgID 2202.) Sheriff Wickersham explained that if an inmate feels aggrieved by having kites ignored, there is a grievance process available for the inmate to bring that to the attention of the jail staff and have the grievance investigated. (*Id*. at 41-42, PgID 2203.)

With respect to any investigation into Ms. Meyers's death, Sheriff Wickersham reviewed the OPS Report prepared by Sergeant Medley to determine whether there were any violations by jail personnel. He satisfied himself that there were not and thus did not seek, although he could have, further investigation of the incident by another county sheriff, or the FBI, or any other agency. (*Id*. at 48-52, PgID 2204-05.) Sheriff Wickersham did not review any of the fellow inmate witness statements that were prepared on the date of Ms. Meyers's death although Sergeant Medley's OPS Report references those statements. (*Id*. at 52-53, PgID 2205-06.) Sheriff Wickersham

believes that the all jail staff acted appropriately with respect to Ms. Meyers's death although he admitted that having to wait five days to see health care for "severe pain" was not an adequate "immediate" response. (*Id.* at 56-60, PgID 2206-07.) Sheriff Wickersham testified that CCS does its own post-death mortality review and the jail does its own separate in-house review, which was conducted by Ms. Sanborn. Sheriff Wickersham did not attend either mortality review and typically does not attend them. (*Id.* 81-82, PgID 2213.) Sheriff Wickersham was not aware of a policy expressly requiring jail staff to monitor inmates's food and water intake. (*Id.* at 89-90, PgID 2215.) Sheriff Wickersham confirmed that the jail contracts with CCS to provide health care to the inmates and CCS is allowed to develop their own policies and procedures for providing that care, making CCS the policy maker for health care at the jail, although the jail has ultimate responsible for the health care and treatment of the inmates, and ensures that CCS is abiding by its contractual obligations through various accreditations that the jail is required to obtain. (*Id.* at 104-07, PgID 2218-19.)

Sheriff Wickersham provides an Affidavit establishing that he never met Ms. Meyers, never had occasion to be in contact with her until after her death – he was not even aware that she was incarcerated at the jail. (ECF No. 82-9, County Defs.' Mot. Ex. 8, Sept. 28, 2017 Affidavit of Anthony Wickersham, PgId 2243.) He did not

directly supervise Ms. Meyers's housing unit or discuss her housing or medical condition with any command or corrections officer prior to her death. Her death was the first and only death at the Macomb County Jail of acute sepsis. (*Id*.)

Michelle Sanborn, the jail administrator at the time of Ms. Meyers's death, provides an Affidavit explaining that she never met with Ms. Meyers and did not have personal involvement with her at anytime prior to her death. (ECF No. 82-10, Oct. 1, 2018 Affidavit of Michelle Sanborn, PgID 2247.) Ms. Sanborn explains that ever since 1990, including, 2013, the Macomb County Jail has met the Michigan Department of Corrections ("MDOC") compliance requirements, including being the first "mega jail" (over 1,000 beds) in Michigan to receive the coveted 100% compliance award. In addition to meeting all MDOC compliance requirements, the County practices and the Sheriff's General Orders have met the rigorous standards of the National Commission on Correctional Health Care ("NCCHC"), which is a widely recognized independent body that monitors the compliance of correctional facilities around the country with 67 different standards. To be accredited, a facility must comply with 100% of the standards deemed "essential," and must be 85% compliant with the standards deemed "important." Between January 7-9, 2013, NCCHC inspectors conducted an on-site review of the Jail and its policies and practices and audited medical records for compliance and granted accreditation following their

review.  The Macomb County Jail has been continuously accredited by the NCCHC since 1998.  Ms. Sanborn is familiar with (indeed drafted) the Macomb County Sheriff's General Orders (some of which are under review in this case) and testifies that each of these policies (5.01, 5.02, 5.04, 5.07, 5.11, 5.12, 5.13, 5.16, 5.19, 5.45) is in compliance with MDOC rules for jails and lock ups, and in compliance with the American Correctional Association Standards for Adult Local Detention Facilities and the NCCHC.  (*Id*. PgID 2247-49.)

In specific, Ms. Sanborn testifies that General Order 5.45 ("Prisoner Health Care"), defers all medical judgment to the health care professionals with whom the jail contracts, as required by the MDOC Administrative Rules for Jails and Lock Ups and in compliance with the NCCHC standards to prevent corrections staff from making medical decisions.  (*Id*. PgID 2249-50.)  In 2011, a committee was formed and the County retained an independent benefits services manager to consult on selecting the most qualified health care provider.  The contract was awarded to CCS in September 2011, and the County entered into an Inmate Healthcare Services Management Agreement with CCS that complies with all NCCHC standards.  Ms. Sanborn actively monitors the Agreement and CCS to make sure that constitutionally adequate care is being delivered to the inmates.  Ms. Sanborn has contact on a daily basis with CCS health care staff, she observes medical rounds on the floors, clinical activities,

screenings, history and physicals, and emergency responses. She attends monthly CCS Medical Advisory Committee meetings and quarterly Continuous Quality Improvement meetings, at which all aspects of prisoner health care are discussed and evaluated. (*Id*. PgID 2250-51.) Ms. Sanborn conducts audits of CCS screenings, initial health assessments, and segregation rounds in order to monitor compliance with NCCHC standards. In the event that non-compliance is revealed, she personally works with CCS staff to bring the procedures back into compliance. (*Id*. PgID 2251.) The County also hired Health Decisions, Inc., an independent contract monitoring firm, to assist the County in overseeing the CCS contract. (*Id*. PgID 2252.) Ms. Sanborn's Deposition mirrors her Affidavit. (ECF No. 82-14, County Defs.' Mot. Ex. 13, Sept. 28, 2017 Deposition of Michelle Sanborn.)

Macomb County Lieutenant Lori G. Misch provides an Affidavit attesting to the training that all Macomb County Corrections Officers receive. All Corrections Officers are required to complete a "Corrections Academy" within their first year of employment, which includes 160 hours of classroom training on the following topics: Booking and Intake: 8 hours; Correctional law: 16 hours; Cultural Diversity: 4 hours; Custody and Security: 24 hours; Defensive Tactics: 40 hours; Ethics: 2 hours; Fire Safety: 12 hours; First Aid/CPR/AED: 8 hours; Interpersonal Communications" 16 hours; Prisoner Behavior: 8 hours; Report Writing: 8 hours; Workplace Harassment:

2 hours; Stress Management: 4 hours; and Suicide Awareness: 8 hours. (ECF No. 82-12, County Defs.' Mot. Ex. 11, Oct. 1, 2018 Affidavit of Lori G. Misch ¶¶ 3-4.) In addition, each officer is required to complete an additional 20 hours of in-service training on an annual basis. (*Id.* ¶ 5.) The modules on Custody and Security, Prisoner Behavior, Suicide Awareness, Interpersonal Communication, and First Aid/CPR/AED are directed to training in the safety and well-being of inmates. (*Id.* ¶ 8.)

### D.   The Medical Expert Testimony

#### 1.   Plaintiff's Medical Expert

Plaintiff's medical expert, Susi Vassallo, MD is a clinical professor of Emergency Medicine at the New York University School of Medicine. (ECF No. 90-28, Pl.'s Resp. Ex. 27, Feb. 15, 2018 Expert Report of Susi Vassallo, PgID 2930-34.) Defendants do not appear to question Dr. Vassallo's expertise or training, who had practiced Emergency Medicine at Bellevue Hospital in New York, which is the primary receiving hospital for male prisoners of Rikers Island Jails. (*Id.* at PgID 2930.) In addition to her MD, Dr. Vassallo also has a Master's Degree in Health Care Management and is a Certified Correctional Health Professional, who has been qualified to act as a medical expert in multiple federal courts. (*Id.*)

Dr. Vassallo begins her medical opinion with a discussion of Ms. Meyers's hospital records from her treatment there on Friday, June 21, 2013, two days before

she was arrested and incarcerated at the Macomb County Jail. (*Id*. at PgID 2931; ECF No. 80, Defs.' Mot. Ex. I, St. John Hospital 6/21/2013 MRI Report, PgID 2000-02.) Dr. Vassallo reports that Ms. Meyers's history, physical exam and testing at St. John's Hospital found that she had a staph infection in her blood and urine, and a spinal epidural abscess. She received one dose of IV antibiotics at St. John's and was discharged on oral antibiotics. (*Id*.) Dr. Vassallo opines that when Ms. Meyers entered the jail on June 25, 2013, her vital signs were abnormal, she was tachycardic with a pulse rate of 100 bpm, and her blood pressure was low, both signs of sepsis. Her temperature was 96.1, two degrees below normal. Dr. Vassallo opines that these abnormal vital signs and knowledge of the recent hospital visit should have triggered immediate medical attention. (*Id*. at PgID 2932.) Dr. Vassallo is critical of the four-day wait Ms. Meyers experienced before obtaining medical care after kiting, and finds that the absence of a record of Ms. Meyers's temperature by Nurse Jones on July 3, 2013 was a failure to obtain a critical vital sign. (*Id*.)

Dr. Vassallo opines that Nurse Jones was operating outside of her scope of practice when she attempted to diagnose Ms. Meyers's condition and assessed her as "alteration in comfort – nonspecific." (*Id*. at PgID 2933.) Dr. Vassallo opines that Nurse Jones was insufficiently trained to recognize the serious medical needs of Ms. Meyers and she opines that both CCS and the jail are at fault for placing a health care

provider without sufficient credentials or training to identify Ms. Meyers's serious medical need, and these failures led to Ms. Meyers's death. Dr. Vassallo opines that had Ms. Meyers's been properly diagnosed and treated for her bacterial infection, she would have lived. (*Id.*)

Dr. Vassallo was deposed in this case, and explained her extensive medical background, and resident teaching experience, none of which is questioned by the Defendants. (ECF No. 77-12, June 28, 2018 Deposition of Susi Vassallo, MD PgID 1894.) Dr. Vassallo testifies that she always teaches her residents that the doctor, not the patient, is the historian and that the examining physician's role is to identify a risk factor, or an abnormal vital sign, or a complaint and drill down in a very proactive way. (Vassallo Dep. 29, PgID 1902.) Dr. Vassallo states, for example, that if she hears a heroin addict complain of back pain, she goes to the most serious pathology because heroin users get infections in their spines. (*Id.* at 33-34, PgID 1903.) Dr. Vassallo is of the opinion that LPNs and RNs, while they may not have the expertise to diagnose, must have the knowledge sufficient to know when to ask for a higher level of care. (*Id.*) Dr. Vassallo admits that there is no evidence in the records of this case that Ms. Meyers told any of the CCS or jail staff where she had her MRI performed, only that she had an MRI and was in the hospital two days prior to her arrest. (*Id.* at 49, PgID 1907.) Dr. Vassallo admits that Ms. Meyers's vital signs were

within the normal range for an adult at intake at the jail, but Dr. Vassallo says that in the context of a heroin user, normal is no longer normal. (*Id*. at 50-54, PgID 1907-08.) Dr. Vassallo states that if her heart rate was high due to nervousness or anxiety, her blood pressure and temperature would not be low. (*Id*. at 53-56, PgID 1908.) Dr. Vassallo admits that none of Ms. Meyers's other conditions, chronic Hepatitis C or bipolar disorder, were in anyway related to her sepsis. (*Id*. at PgID 1909.) Nor was her arm abscess from two months earlier connected to her sepsis. (*Id*.) Dr. Vassallo was critical of the brevity of the intake screening form but most critical of Nurse Jones's failure to follow up on the fact that Ms. Meyers was a heroin user and was in the hospital two days prior for a pregnancy test and had an MRI of her back, and the failure of the records to reflect each question asked and the answers given. (*Id*. at PgID 1910-11.) Dr. Vassallo also understands the term "urgent" to mean someone is in need of immediate medical attention and "emergent" means call 911. (*Id*. at 67-69, PgID 1911-12.) Dr. Vassallo opined that the definitions of "emergent, urgent, routine," should have been spelled out in the CCS policy and not left to the discretion of the CCS nurses. (*Id*.)

The essence of Dr. Vassallo's opinion is that Nurse Jones should have realized that when a heroin user presents with back pain, its likely not a muscular ache but more likely a bony infection of some type. (*Id*. at 77, PgID 1914.) She does not

dispute that Nurse Jones stated that she did take Ms. Meyers's temperature and if she had found it elevated, she would have proceeded down a pathway for fever. (*Id*. at 82-85, PgID 1915.) Dr. Vassallo opines that the absence of a recorded temperature is "absolutely outrageous," as was the assessment of "muscular ache." (*Id*. at 85-86, PgID 1916.) Dr. Vassallo testifies that if you have worked with prisoners and heroin addicts as she has, you know that back pain and low temperature mean that the person is dying of an infection and that Nurse Jones should have known that Ms. Meyers's vitals were not normal for a heroin user and should have provided different treatment. (*Id*.) Her opinion is that an LPN, an RN or any medical provider would have known that Ms. Meyers was in a critical condition. She opines that because CCS staffed sick call with somebody who had no medical knowledge and assessed a muscular ache, Ms. Meyers died. (*Id*. at 89-91, PgID 1917.) Dr. Vassallo admits that the SOAP form prepared by Nurse Jones does not contain any findings that would have directed Nurse Jones down a different pathway, but her criticism is that Nurse Jones did not look closely enough. (*Id*. at 94-96, PgID 1918.) The pathway that Nurse Jones was following, in Dr. Vassallo's opinion, did not direct Nurse Jones to ask any of the important questions in this case. Her SOAP form finds no abnormalities but she was not asking the right questions, not looking for the right things, because this pathway led her down the wrong path. (*Id*. at 97-100, PgID 1919.) Dr. Vassallo opines that

when Nurse Jones found "severe discomfort" back pain (which the records indicate Ms. Meyers's complained of because Nurse Jones prescribed Tylenol which is only indicated in the pathway for "severe discomfort") in an IV heroin user who just had an MRI of her back, it was obvious to any medical professional that Ms. Meyers was in critical condition. (*Id*. at 101-03, PgID 1920.)

In the end however, Dr. Vassallo does not place the blame on Nurse Jones, and states that "through no fault of her own" Nurse Jones was insufficiently trained to recognize Ms. Meyers's condition and was directed down the wrong the pathway. (*Id*. at 104-06, PgID 1920-21.) When informed that, under Michigan's Public Health Code, an LPN may perform nursing activities under the supervision of a nurse or a physician, Dr. Vassallo withdrew her opinion that Nurse Jones was not qualified to evaluate Ms. Meyers. (*Id*. at 110-12, PgID 1922.)

Dr. Vassallo expressed the same opinion with regard to Nurse Black, who was the Director of Nursing and who, when seeing the information collected by Nurse Jones, i.e. a heroin user with back pain who had been seen in a hospital two days earlier and undergone an MRI, should have recognized a life-threatening situation and should never have signed off on Nurse Jones's report. Dr. Vassallo opines that Nurse Black should have elevated Ms. Meyers to see a doctor – but she stops short of saying that Nurse Black actually appreciated the significance of Ms. Meyers's condition and

chose not to move her to higher level of care – specifically she stated that she did not "know what [Nurse Black] did or did not appreciate," and "d[id] not know what was in her mind." She only knows what she should have done. (*Id*. at 113-117, 124-28 PgID 1923, 1925-27.) Dr. Vassallo had no opinion regarding Chantalle Brock's treatment of Ms. Meyers, or Kelly Hedtke's, or any other individual CCS Defendant. (*Id*. at 116-18, PgID 1923-24.)[4]

## 2. Defendants' Medical Experts

Defendants' correctional nursing expert, Kathryn J. Wild, RN, MPA, CCHP-RN, who has been an RN since 1984 and has worked in the correctional healthcare field for the past 31 years, opines that the medical intake screening completed on Ms. Meyers on her admission to the jail met with the NCCHC, MDOC, and CCS policies and procedures for inmate receiving screening. (ECF No. 77-11, Defs.' Mot. Ex. K, March 19, 2018 Expert and Supplemental Report of Kathryn J. Wild 9-12, PgID 1885-85.) Ms. Wild notes that at the time of screening, Ms. Meyers was alert and oriented, and denied using any illegal substance within a month of her booking. Her vital signs were normal, and although she had a history of prior drug use, there was no indication

---

[4] Plaintiff also proffers the testimony of proposed expert Dr. L. J. Dragovic. The Court has issued a separate Opinion and Order entered this day finding Dr. Dragovich's opinions inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

that she should be placed on withdrawal monitoring. Ms. Meyers was appropriately referred chronic care and mental health follow up. (*Id*. at 10, PgID 1886.) Ms. Wild opines that health care personnel must rely on the patient to report accurate information during screening and that there was nothing in Ms. Meyers's presentation or prior incarceration history that required additional or different referrals. (*Id*.) Ms. Wild opines that Nurse Jones's July 2, 2015 assessment and intervention level was well within the standard of care based on Ms. Meyers's presentation of complaint of pain in her lumbar area with no obvious abnormalities noted and normal vital signs. (*Id*. at 11, PgID 1887.) Ms. Wild opines in her Supplemental Report, in response to Dr. Vassallo's opinions regarding Nurse Jones's scope of practice, that under Michigan's Public Health Code, an LPN may perform nursing activities under the supervision of a nurse or a physician. (*Id*. at PgID 1890.) Nurse Jones's assessment of Ms. Meyers was reviewed by the supervising nurse, Nurse Black the next morning and Nurse Jones was working well within her scope of practice as an LPN in the State of Michigan. (*Id*. at PgID 1890.)

Defendants' medical expert Arnold J. Feltoon, MD, FAAEM, CCHP, opines that Ms. Meyers gave no information as part of her medical screening that would suggest any recent or concurrent acute illness, and that at the time of her examination by Nurse Jones on July 2, 2013, there was nothing to suggest any type of serious

illness or injury. (ECF No. 77-13, CCS Defs.' Mot. Ex. M, July 14, 2017 Expert Report of Arnold Feltoon 4-5, PgID 1944-45.) Dr. Feltoon opines that because Ms. Meyers was not forthcoming with nursing staff about the type of MRI she had or the reason the test was ordered, or the results of the MRI, there was no reason to connect the MRI with a 9-day history of back pain. (*Id.* at 1945.) Dr. Feltoon opines that Ms. Meyers died from multiple infectious processes likely caused by her IV drug abuse and there is no evidence that her condition changed between July 2, 2013, when she was evaluated by Nurse Jones, and July 7, 2013, when she died. (*Id.*)

Defendants' medical expert, Dr. Randall R. Stoltz, MD, CCHP, notes that Ms. Meyers denied any need for medical attention when she entered the jail on June 25, 2013, and she did not mention any previous MRI or back pain during her receiving screening, when she appeared normal and oriented and expressly denied sweats or fatigue. (ECF No. 77-14, CCS Defs.' Mot. Ex. N, July 13, 2017 Expert Report of Randall Stoltz at 4, PgID 1951.) Dr. Stoltz opines that on July 2, 2013, Ms. Meyers had good range of motion and no other symptoms apart from back pain that started nine days earlier and it is unsurprising that Ms. Meyers was laying in her bunk often as she had explained to fellow inmates that she had broken her back. (*Id.* at PgID 1952.) Dr. Stoltz opines that if Ms. Meyers had informed CCS or jail staff that she had an MRI suggesting an abscess, further follow up may have been indicated. But

as Ms. Meyers did not present with any outward symptoms of illness or infection to either medical or mental health care staff, and did not inform them of the reason for or result of her MRI, their course of conduct was appropriate. (*Id*.) On March 19, 2018, Dr. Stoltz supplemented his July 13, 2017 Expert Report after reviewing Dr. Vassallo's and Dr. Dragovic's expert reports, and stated that Dr. Vassallo relied on information that the CCS medical staff never possessed and that based on what the CCS staff, including Nurse Jones and Ms. Brock, did know and observe, the medical care delivered was appropriate and the nursing protocol was properly followed. (*Id*. at PgID 1954.) Dr. Stoltz noted that Ms. Meyers had many opportunities to express her complaints to both jail and medical staff, in particular at her mental health visit with Ms. Brock on July 3, 2013, when Ms. Meyers appeared normal and well-oriented and conversational. (*Id*. at PgID 1955.)

## II. LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich.

2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226

F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III.   ANALYSIS

### A.   Plaintiff's Eighth Amendment Deliberate Indifference Claim Against the Individual Defendants

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "'It is clear that a private entity which contracts with the state to perform a traditional state function such as providing medical services to prison inmates [here CCS] may be sued under § 1983 as one acting 'under color of state law.'" *Carl v. Muskegon County*, 763 F.3d 592, 596 (6th Cir. 2014) (quoting *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993)). "The constitutional right at issue [here] arises from the Eighth Amendment's prohibition on cruel and unusual punishment because [Meyers] was serving a criminal sentence at the time [s]he died." *Shadrick v. Hopkins County, Ky.*, 805 F.3d 724, 736 (6th Cir. 2015). The Eighth Amendment "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890,

895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

"An Eighth Amendment claim has two components, one objective and one subjective. " *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). The objective component is satisfied if the plaintiff alleges that the medical need at issue is "sufficiently serious." *Id*. at 703 (quoting *Farmer*, 511 U.S. at 834). "[A] medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore*, 390 F.3d at 897 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)) (emphasis in original). Also "[c]ourts have analyzed the seriousness of a deprivation by examining the effect of the delay in treatment." *Taylor v. Franklin County, Ky.*, 104 F. App'x 531, 538 (6th Cir. 2004) (citing *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)). "A medical condition is sufficiently serious to confer constitutional protections where delay in treatment may cause 'a serious medical injury.'" *Kindl v. City of Berkley*, 798 F.3d 391, 401 (6th Cir. 2015) (quoting *Blackmore*, 390 F.3d at 898).

In *Taylor*, plaintiff was suffering from an undiagnosed tumor that was pressing on his spine and cutting off blood supply to his spinal cord, resulting in bouts of incontinence and pain in his back. The Sixth Circuit explained that based on

plaintiff's expert's testimony as to the seriousness of the tumor and to the effect of its continued growth during plaintiff's incarceration, plaintiff's signs of incontinence and back pain were manifestations of a serious medical condition, whether or not defendants appreciated that seriousness:

> To satisfy the objective component, Plaintiff must establish that his medical needs, which included claims of serious back pain, loss of feeling in his feet and legs, and bouts of incontinence, were "sufficiently serious" to warrant the requisite medical attention.
>
> > \*　　　　\*　　　　\*
>
> Here, Plaintiff was plagued with terminal cancer of the spine. This ailment seriously affected Plaintiff's mobility and control of his bladder, while causing great pain in his spinal column and lower extremities.
>
> > \*　　　　\*　　　　\*
>
> Given the verified medical testimony of the seriousness of Plaintiff's condition, this Court views Plaintiff's complaints of back pain, loss of mobility and bladder incontinence as serious medical conditions which placed Plaintiff in substantial risk of developing greater health problems when left untreated.

*Taylor v. Franklin County, Ky.*, 104 F. App'x 531, 538 (6th Cir. 2004).

Similarly here, Plaintiff has placed into the record verifying expert medical evidence that Plaintiff's alleged symptoms of severe back pain and sweating were manifestations of her underlying very serious medical condition (acute sepsis) that ultimately resulted in her death. While Defendants may or not have appreciated the seriousness of these symptoms and may or may not have consciously chosen to ignore

them (the subjective component) Plaintiff has satisfied the objective component. *See also North v. Cuyahoga County*, 754 F. App'x 380, 387 (6th Cir. 2018) (finding that plaintiff's undiagnosed endocarditis, which plaintiff's expert testified was "a serious and potentially fatal medical issue," was an objectively serious medical need satisfying the objective component of the deliberate indifference analysis); *Winkler v. Madison County*, 893 F.3d 877, 890-91 (6th Cir. 2018) ("There is no question that Hacker's perforated duodenal ulcer, which ultimately caused his death, met this objective component." (citing *Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)); *Smith v. Campbell County, Ky.*, No. 16-13, 2019 WL 1338895 (E.D. Ky. March 25, 2019) (finding that plaintiff with an undiagnosed epidural abscess and osteomyelitis of the spine resulting in sepsis and paraplegia satisfied the objective component of the deliberate indifference analysis). Here Plaintiff's expert testified that Ms. Meyers's epidural abscess could have been treated and she could have been saved and she died from the untreated epidural abscess. At this stage we must accept that expert testimony as true. *Kindl*, 798 F.3d at 402. For purposes of the deliberate indifference analysis, Plaintiff has satisfied the objective component.[5]

---

[5] The Sixth Circuit recently observed that it "has previously held medical conditions resulting in death are sufficiently serious" to "automatically" satisfy the objective component. *Blaine v. Louisville Metro. Gov't*, No. 18-5224, at 14 n. 12 (6th Cir. April 16, 2019) (citing *Winkler*, 893 F.3d at 890-91). Even were that not the case, here, as in *Blaine*, Plaintiff cannot satisfy the subjective component, with the result that the

"To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703. "The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703 (citing *Estelle*, 429 U.S. at 106, 97 S.Ct. 285; *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970). *See also Johnson v. Karnes*, 398 F.3d 868, 875 (6th Cir. 2005) ("a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment" so that "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.") "Although the [] subjective standard 'is meant to prevent the constitutionalization of medical malpractice claims,' a plaintiff need not show that the officer acted with the specific intent to cause harm. *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 540 (6th Cir.

---

Court need not conclusively determine the objective component. Nonetheless, the Court finds ample precedent to conclude that the objective component is satisfied here.

50

2008) (quoting *Comstock*, 273 F.3d at 703). "Indeed, 'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'" *Id.* (quoting *Farmer*, 511 U.S. at 836).

Because officials "do not readily admit this subjective component, [] 'it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge.'" *Id.* (first alteration added). The subjective component can "be established simply by showing that the correctional officer 'refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Richko v. Wayne County, Mich.*, 819 F3d 907, 918 (6th Cir. 2016) (quoting *Farmer*, 511 U.S. at 843 n. 8). *See also Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (observing that "a factfinder may infer actual knowledge through circumstantial evidence, or may conclude a prison official knew of a substantial risk from the very fact that the risk was obvious") (internal citation and quotation marks omitted). "[A] prison official may 'not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risks he strongly suspected to exist." *Taylor*, 104 F. App'x at 539 (quoting *Farmer*, 511 U.S. at 843 n. 8.) "Expert testimony that speaks to the obviousness of a risk can be used to demonstrate a dispute of material fact regarding whether a prison doctor exhibited

conscious disregard for the plaintiff's health." *Smith v. Campbell County*, 2019 WL

1338895, at *14 (citing *LeMarbe v. Wisneski*, 266 F.3d 429,437-38 (6th Cir. 2001)

(finding that where plaintiff presented substantial expert testimony that it would be

"obvious to anyone with a medical education" that the presence of five liters of bile in

plaintiff's abdomen required immediate surgical attention, a reasonable factfinder

could conclude that a doctor who failed to seek that attention was aware of a

substantial risk of harm and consciously disregarded that risk by failing to stop the bile

leak in a timely manner)).

A particular defendant's level of knowledge and training also must be

considered in the subjective analysis:

> The question of whether an official actually perceived, inferred, or
> disregarded a risk is a question of fact for the jury "subject to
> demonstration in the usual ways, including inference from circumstantial
> evidence." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970; *Clark–Murphy v.
> Foreback*, 439 F.3d 280, 290 (6th Cir. 2006). Yet a court must also
> consider other factors—such as the obviousness of the risk, the
> information available to the official, the observable symptoms, *and the
> expected level of knowledge of the particular official. Farmer*, 511 U.S.
> at 842–43, 114 S.Ct. 1970; *LeMarbe*, 266 F.3d at 436–39. If a risk is
> obvious or if it is well-documented and circumstances suggest that the
> official has been exposed to information such that she must have known
> of the risk, the evidence is sufficient for a jury to find that the official had
> knowledge. *Farmer*, 511 U.S. at 842–43, 114 S.Ct. 1970.

*Sours v. Big Sandy Regional Jail Authority*, 593 F. App'x 478, 484 (6th Cir. 2014)

(emphasis added).

Corrections officers are entitled to rely on the medical judgment of prison healthcare providers and "commit[] no act of deliberate indifference in adhering to [the] advice" of a medical professional because "nonmedical jail personnel are entitled to reasonably rely on the assessments made by the medical staff." *Winkler*, 893 F.3d at 895 (citing *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009) and quoting *McGaw v. Sevier County, Tenn*., 715 F. App'x 495, 498-99 (6th Cir. 2017)). In *McGaw,* the Sixth Circuit explained:

> Defendant officers were entitled to qualified immunity because they did not act with deliberate indifference to McGaw's medical needs when they relied on what they reasonably believed to be appropriate advice from Nurse Sims. Here, the officers placed McGaw in the observation cell because they reasonably believed, based on Nurse Sims's assessment, that this was the medically appropriate thing to do, and are thus entitled to qualified immunity for acting pursuant to that assessment. None of the officers had medical training, and there is no evidence that they knew or believed that Nurse Sims's diagnosis was anything but correct. As the Third Circuit has reasoned, where "a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). The record does not show any evidence that the officers were or should have been aware that their lay understandings of this situation were superior to Nurse Sims's trained assessment. In retrospect, it appears clear that Nurse Sims's recommendation should have been for McGaw to be taken to the hospital, but the question of whether the officers acted with deliberate indifference is based on what the officers themselves knew at the time. *See Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009). Without any indication that the officers could or should have assessed any deficiency in Nurse Sims's diagnosis at the time she made it, the officers are entitled to qualified immunity when they acted on her counsel.

715 F. App'x at 497.  *See also Hamilton v. Pike County, Ky.*, No. 11-99, 2013 WL

529936, at *7 (E.D. Ky. Feb. 11, 2013) (Thapar, J.) ("Non-medical prison officials,

such as Jailer Scott, act reasonably when they rely on the judgment of the prison

medical staff.") (collecting circuit cases holding same).  Specifically, jail staff may

reasonably rely on the medical care provided by an LPN.  *McGaw*, 715 F. App'x at 498

("Nor has this court ever recognized the status of an LPN as precluding an officer from

relying on that LPN's judgment").[6]

---

[6] As discussed *infra*, the Sixth Circuit in *McGaw* found no deliberate indifference on
the part of the jailers but also declined to dismiss the claim against the County for
failure to properly train the jailers.  The court held:

> [T]his court lacks jurisdiction over Sevier County's claim because the
> county's liability is not foreclosed by our determination that the officers
> were entitled to qualified immunity. The district court denied the county's
> motion for summary judgment because it held that there were genuine
> issues of material fact as to whether the county had properly trained its
> officers to recognize inmates' medical needs. The fact that these officers
> did not act with deliberate indifference because they reasonably relied on
> Nurse Sims's diagnosis of McGaw's needs does not resolve the disputes
> over whether the county's training procedures were adequate or
> appropriate as a whole. Lack of training could conceivably have affected
> Nurse Sims's action, and that would not at all intertwine with the officers'
> immunity claims. Without such intertwining, pendent appellate
> jurisdiction is lacking, and it is not appropriate for us to exercise it here.

715 F. App'x at 499.  The Sixth Circuit was referring to the district court's ruling that
because "the County never trained its officers by providing them with any necessary
medical training in order to countermand the decision-making of the on-site medical
contractors . . . a reasonable jury could conclude that Sevier County's failure to train
its correction officers regarding medical emergencies was the result of the County's

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In determining whether the government officials in this case are entitled to qualified immunity, we ask two questions: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff has shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Phillips*, 534 F.3d at 538-39. If multiple government officials are alleged to have violated a plaintiff's [Constitutional] rights, each officer's conduct must be analyzed individually.

Although CCS and the Defendant CCS nurses are considered state actors for purposes of being amenable to suit under § 1983, *see West, supra*, "[b]eing subject to suit under § 1983, however, does not mean that a party has the right to assert qualified

---

deliberate indifference." *McGaw v. Sevier Cty.*, No. 3:15-cv-12, 2016 U.S. Dist. LEXIS 191689, at *17-21 (E.D. Tenn. Nov. 14, 2016). As discussed *infra*, *McGaw* is not the only case expressing a sentiment on the part of the Sixth Circuit to permit a claim against the municipality to go forward despite the absence of a constitutional violation on the part of an individual defendant. Here, Plaintiff has not named any of the individual Defendant corrections officers and has not filed a claim against any of them for deliberate indifference. Nonetheless, the Court will analyze Plaintiff's policy claim against the County on the assumption that the Sixth Circuit would allow such a claim to proceed under these circumstances.

immunity." *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) ("Here [] there are no special concerns to distinguish [CCS] from other private firms and thus, there is no need to extend qualified immunity to Defendant nurses.").  And of course, the doctrine of qualified immunity does not protect municipalities.  "[T]he doctrine of qualified immunity safeguards only certain *natural person* defendants in their individual capacities." *Scott v. Clay County, Tenn*., 205 F.3d 867, 880 (6th Cir. 2000) (emphasis in original).  Finally, under § 1983, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008)).

## 1.    Individual capacity supervisory liability claim against Sheriff Wickersham.

Sheriff Wickersham had no interaction with Ms. Meyers and had no knowledge of her presence in the jail until after her death and Plaintiff does not suggest otherwise. Plaintiff sues Sheriff Wickersham in his individual capacity in his supervisory role as the individual responsible for jail operations, arguing that Sheriff Wickersham tolerated Officers DeHate and Hill's deliberate indifference to Ms. Meyers's serious medical needs.  Plaintiff's theory of liability against the Sheriff appears to be that the Sheriff knew that his corrections officers lacked medical training on how to identify a serious medical need such as acute sepsis and yet he failed to supervise them appropriately.  Plaintiff's Response devotes less than one full page to supporting the

56

argument that Sheriff Wickersham is liable in his individual capacity under a theory of supervisory liability. (Pl.'s County Resp. 19, PgID 3107.) As a threshold matter, Plaintiff appears to "'improperly conflate[] a § 1983 claim of individual supervisory liability with one of municipal liability.'" *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (quoting *Phillips*, 534 F.3d at 543). It is well established that supervisory liability "cannot be premised solely on a theory of respondeat superior, or the right to control employees." *Id*. at 647. "A supervisor is not liable pursuant to § 1983 for failing to train unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Phillips*, 534 F.3d at 541 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

Here, Plaintiff has produced no evidence that Sheriff Wickersham had any knowledge of Ms. Meyers's medical condition or of how she was being treated by either corrections officers or CCS staff until after her death. There is absolutely no evidence that Sheriff Wickersham encouraged, approved, authorized, or knowingly acquiesced in any of the conduct about which Plaintiff complains. Here, as in *Phillips*,

> [t]he Estate's general allegations that the correctional officers and [CCS staff] were not properly trained are more appropriately submitted as evidence to support a failure-to-train theory against the municipality itself, and not the supervisors in their individual capacities. *See City of*

> *Canton v. Harris*, 489 U.S. 378, 385 (1989) (recognizing that a systematic failure to train officers adequately as a custom or policy may lead to city liability). While an individual supervisor may still be held liable in his or her individual capacity under a failure-to-train theory, the Estate must point to a specific action of each individual supervisor to defeat a qualified immunity claim.

*Phillips*, 534 F.3d at 533-34.

"[T]o be liable in a supervisory capacity under § 1983, courts have held that the supervisor must have some contemporaneous knowledge of his subordinates' unconstitutional conduct that resulted in a direct injury to the plaintiff." *Smith v. Campbell County,* 2019 WL 1338895, at *20. In *Smith*, the court granted summary judgment to the supervising jailer in his individual capacity on a supervisory liability claim where the jailer had "no personal interaction with Smith while he was detained," and had no knowledge that Smith was complaining of back pain and problems breathing that were not being properly addressed by his staff. *Id*. at *20-21. Here, it is undisputed that Sheriff Wickersham had no actual knowledge of Ms. Meyers's or her condition or her treatment by jail or medical staff until after her death. Plaintiff has pointed to no "specific action" on the part of Sheriff Wickersham that suggests his direct involvement in or encouragement of, or knowing acquiescence in, the alleged unconstitutional conduct about which Plaintiff complains. *Smith*, 2019 WL 1338895, at *21. The general allegations regarding the Sheriff's failure to properly train his corrections staff or his failure to investigate or discipline officers after Ms. Meyers's

death, are more appropriately directed to Plaintiff's municipal liability claim against the County, which is discussed at length *infra* at Section IIIB. Plaintiff has not created a genuine issue of material fact sufficient to defeat Sheriff Wickersham's qualified immunity in his individual capacity on a supervisory liability claim.

## 2. Individual capacity claims against the CCS nursing staff Defendants.[7]

The touchstone of the second prong of the constitutional analysis is subjective awareness – that the medical provider actually perceived a risk of harm and consciously chose to ignore that risk:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle*, 429 U.S. at 106. And, while this subjective component may be established "in the usual ways, including inference from circumstantial evidence," *Farmer*, 511 U.S. at 842, the jury cannot be left to speculate regarding the possibility that a defendant possessed such knowledge. "When instructing juries in deliberate indifference cases

---

[7]Plaintiff alleged in the Complaint individual liability claims against several CCS staff, but proceeds as to only two – Nurses Jones and Black. Plaintiff agreed to dismiss with prejudice Defendants Dr. Lawrence Sherman, Kelly Hedtke, and Chantalle Brock. (Pl.'s Resp. 24, PgID 2722.)

with such issues of proof, courts should be careful to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that the defendant should have known, and juries should be instructed accordingly." *Id*. at 842 n. 8.

"[T]he mere existence of delay in receiving treatment is not enough for a jury to find deliberate indifference." *Santiago v. Ringle*, 734 F.3d 585, 593 (6th Cir. 2013) (discussing the subjective component of the deliberate indifference analysis and citing *Reilly v. Vadlamudi*, 680 F.3d 617, 625–27 (6th Cir. 2012)). "On summary judgment, [Plaintiff] may not simply point to a delay and argue that a jury might not believe the doctor's explanation; he must put forth some additional evidence of deliberate indifference, since ultimately he has the burden of proof at trial." *Id*. (citing *Celotex*, 477 U.S. at 322–24).

## 1.    Nurse (Noland) Jones

There is insufficient evidence in this record that Nurse Jones subjectively perceived that Ms. Meyers was facing a substantial risk of immediate serious medical harm and consciously chose to do nothing about that risk. There is no evidence in this record that Nurse Jones observed Ms. Meyers sweating profusely or emitting a foul odor. Nor is there evidence that Nurse Jones was aware that Ms. Meyers had not been leaving her cell and was being served meals in her cell. There is no evidence that the

observations of Ms. Meyers's fellow inmates ever made it up the chain to Nurse Jones or Nurse Black. In fact, both CCS staff who personally examined Ms. Meyers described her demeanor as normal, both on July 2, 2013, when Ms. Meyers was seen by Nurse Jones and on the next day, July 3, 2013, when Ms. Meyers was seen by mental health worker Chantalle Brock.[8] The testimony of Plaintiff's expert, Dr. Vassallo, may support a negligence claim against Nurse Jones, but it does not support a deliberate indifference claim. Dr. Vassallo opines that Nurse Jones "should have known" that Ms. Meyers's previous heroin use, combined with her back pain and recent MRI, indicated a serious systemic infection of some type and not just a non-specific back pain that could be treated with Tylenol. It is undisputed that Ms. Meyers's vital signs on July 2, 2013, were within normal limits for an adult – and nothing in the record supports an inference that Nurse Jones suspected that Ms. Meyers had any underlying conditions that would suggest that her within-normal-range vital signs were in fact abnormal. There is no evidence that when she presented for her medical visit with Nurse Jones, Ms. Meyers was sweating profusely or smelling badly, or had an elevated temperature, or was exhibiting any signs to Nurse Jones that would

---

[8] Plaintiff attempts to impute this knowledge to the CCS staff through the "expert" testimony of Dr. L.J. Dragovic. As noted *supra*, for the reasons stated in a separate Opinion and Order issued this day, Dr. Dragovich's testimony fails to pass the threshold of admissibility under *Daubert*.

have caused her to draw the inference that Ms. Meyers was actually suffering from some underlying condition that was being masked by her normal vital signs and normal appearance on exam. Nurse Jones interpreted Ms. Meyers's symptoms according to the nursing protocol she was instructed to follow, and followed that pathway to conclusion, which suggested the intervention of Tylenol if Ms. Meyers's pain was severe. Nurse Jones prescribed the Tylenol for Ms. Meyers "as needed" and completed the pathway protocol, as confirmed by Nurse Black's review and signature on Nurse Jones's Note. "'[C]ourts are generally reluctant to second the medical judgment of prison officials.'" *Rouster*, 749 F.3d at 448 (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 944 (6th Cir. 2010)). Nurse Jones assessed Ms. Meyers's symptoms and followed the pathway that she believed was indicated by her objective findings. In Dr. Vassallo's opinion Nurse Jones followed the wrong pathway and should have escalated Ms. Meyers's care to a physician's assistant or a doctor. This opinion is not sufficient to create a question of fact on the issue of Nurse Jones's deliberate indifference. Dr. Vassallo began her opinion discussing a host of information that Nurse Jones did not have. Dr. Vassallo opines that had Nurse Jones known of the results of Ms. Meyers's MRI, a "critical piece of information," Nurse Jones might have been able to conclude or at least suspect that Ms. Meyers was in fact suffering from a serious medical condition despite her normal vital signs at the time. As the Sixth Circuit reasoned in

*Rouster* on similar facts:

> Had Conley been subjectively aware of the seriousness of Jerry's medical condition, her decision to treat him only with over-the-counter medication might have been so cursory as to amount to a conscious disregard of his needs. However, Rouster has not shown that Conley was in fact aware that Jerry had a serious medical need. Indeed, Conley did not have one very critical piece of information, which might have allowed us to draw such a conclusion: she did not know that Jerry had been treated the previous year for a perforated duodenal ulcer. *Cf. Westlake*, 537 F.2d at 859 (concluding that a prisoner stated a claim of deliberate indifference because prison officials provided no treatment even after the prisoner informed them that he suffered from an ulcer and needed medication and a special diet). It is true that the medical experts retained in this case testified that Conley should have called a physician whenever any inmate complained of "significant abdominal pain." R. 99–6 (Gouge Dep. at 40) (Page ID # 1881). However, Conley's failure to follow best medical practices is not necessarily evidence of deliberate indifference if she did not know that Jerry's stomach pain was caused by a serious ailment. Furthermore, even if Conley should have known that Jerry's abdominal "guarding" was indicative of a serious medical condition, she was not deliberately indifferent because she inferred that he was clenching his muscles on purpose as he attempted to sit up and get off the table. Indeed, Conley did not have the training to understand the significance of the symptoms she observed during her abdominal assessment. R. 95–5 (Tennesen Dep. at 167–68) (Page ID # 1096). Therefore, Conley did not display deliberate indifference to a known serious medical need during her first interaction with Jerry, at the time he complained of stomach pain.

*Rouster*, 749 F.3d at 448-49.

Importantly, the Sixth Circuit has instructed that the deliberate indifference analysis must be specific to each individual defendant and must take into account "the expected level of knowledge of the particular official." *Sours* , 593 F. App'x at 484 (citing *Farmer*, 511 U.S. at 842–43 and *LeMarbe*, 266 F.3d at 436–39). *Smith v.*

*Campbell County*, *supra*, is a recent and thorough opinion analyzing claims of deliberate indifference involving similar facts, and is instructive here. Smith, a known IV heroin drug abuser, was incarcerated at the Campbell County Detention Center ("CCDC") and was suffering from an *undiagnosed* epidural abscess and osteomyelitis of the spine, which ultimately resulted in "sepsis and acute paraplegia of the lower part of his body." 2019 WL 1338895, at *1. On his admission to the CCDC, Smith advised prison staff of several health issues, including heroin withdrawal, depression, anxiety, leg pain, and a history of pain and bone fractures in his back. *Id*. Smith submitted several kites complaining of, among other things, severe back pain "that was a 10 on the pain scale." *Id*. at *2. Smith filed his fourth Sick Call Slip stating that he needed to see a doctor "ASAP" regarding his back pain and was seen by Nurse Clarkson, who noted "prior back injury" and normal vitals and did not refer him to a physician or order treatment in addition to the Tylenol he had already been prescribed. *Id*. Two days later, Smith filed his fifth Sick Call Slip complaining of back pain, numbness, and tingling and was seen by Nurse Doremus, who followed a clinical pathway form that did not mention the numbness or tingling. Nurse Doremus prescribed Naproxen for Smith's pain. *Id*. Two days later, Smith saw a physician for the first time, Dr. Kalfas, who examined Smith, observed Smith's heroin use and chronic back pain, which Dr. Kalfas attributed to degenerative disc disease, and prescribed an anti-inflammatory and

a muscle relaxant. *Id*. Smith continued to complain, noting that he had been experiencing this pain for 25 days and again was scheduled to see Dr. Kalfas, who diagnosed Smith with malingering and exaggerating his pain. *Id*. at *3. Ultimately Smith was transported to the hospital for a mental status evaluation because of "psychosomatic complaints of lower extremity paralysis." *Id*. at *5. It was determined at the hospital that Smith had a spinal abscess and osteomyelitis of the spine. He underwent an emergency laminectomy and was unable to ambulate upon discharge from the hospital. *Id*.

The district court ultimately determined that a reasonable jury could conclude that Dr. Kalfas, who "specialize[d] in 'addiction medicine,' . . . [and] was well-aware of the general risk of bone infection for a patient fitting Smith's profile," had "refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id*. at *12-13 (quoting *Comstock*, 273 F.3d at 703)). The district court found that there was "direct and circumstantial evidence that Dr. Kalfas inferred a risk of injury from a more serious condition which he did not adequately investigate or treat." *Id*. at *14.

Importantly, however, the court reached a different conclusion with respect to the conduct of Nurse Clarkson and Nurse Doremus, both of whom had examined Smith and been made aware of his symptoms but neither of whom escalated his care or

ordered further testing or treatment. The district court reasoned:

> Based on the evidence in the record, no reasonable jury could find that Nurse Clarkson was deliberately indifferent to Smith's serious medical needs. First, unlike Dr. Kalfas, there is no evidence that Nurse Clarkson was educated on the heightened risk of infection for IV heroin users or had any experience treating spinal infections. . . . Based on Smith's reported health history and symptoms, it was reasonable for Nurse Clarkson to believe he was suffering from chronic back pain from a prior accident or that he had pulled a muscle when he sneezed two weeks earlier.

2019 WL 1338895, at *15. The district court observed the same with regard to Nurse Doremus: "Unlike Dr. Kalfas, Nurse Doremus was not familiar with the heightened risk of infection from IV heroin use. Nor is there evidence that she had experience treating osteomyelitis." *Id*. at *17. Both nurses were granted summary judgment.

The same is true here. There is absolutely no evidence in this record to suggest that Nurse Jones had any experience treating spinal infections in IV drug users or had any awareness of the connection between IV drug use and bony infections of the spine. And while Dr. Vassallo opines that Nurse Jones should have drilled down on the MRI and made herself aware of those results, there is simply no evidence that she did or that she consciously chose not to do so knowing that Ms. Meyers was suffering from a serious medical condition. While Nurse Jones did not have a specific recollection of her examination of Ms. Meyers, Nurse Jones testified that she would have inquired about where Ms. Meyers had her MRI and would have asked about the results. Nurse

Jones testified: "With my nursing, I always ask the patient where they would have received their MRI or any type of outpatient labs, testing, anything like that. At that time she did not disclose it to me since it is not noted on the record." (ECF No. 77-4, Jones Dep. 57, PgID 1805.) The fact that her notes do not indicate any further information regarding the MRI means that Ms. Meyers did not disclose any further information to Nurse Jones and there is no evidence in this record to suggest otherwise. *See North*, 754 F. App'x at 388 (crediting nurse's testimony of what her notes revealed even though the nurse had no memory of the incident). Dr. Vassallo is also critical of Nurse Jones's failure to record Ms. Meyers's temperature during the July 2, 2013 visit, but Nurse Jones explained that the absence of a notation meant that the temperature was normal – otherwise she would have been directed down an entirely different pathway: "With my nursing, I always take a complete full set of vital signs. . . . If the temperature would have been even a low grade fever or a fever, it would have been noted in the remarks section and another nursing protocol would have been initiated." (Jones Dep. 57-58, PgID 1805.) In the end Dr. Vassallo does not place the blame on Nurse Jones, and states that "through no fault of her own" Nurse Jones was insufficiently trained to recognize Ms. Meyers's condition and was directed down the wrong the pathway. (*Id*. at 104-06, PgID 1920-21.) There is no evidence to support a finding that Nurse Jones did draw the inference that Ms. Meyers was facing a

67

substantial risk of harm and then disregarded that risk by prescribing Tylenol and instructing Ms. Meyers to kite further if she continued to have problems. The records reflect that Ms. Meyers did not kite again.[9]

Here Nurse Jones conducted a full exam, noted normal vitals, followed the appropriate pathway protocol based on her objective findings, and reached a diagnosis that was consistent with Plaintiff's symptoms. Plaintiff did not kite medical again. There is no evidence that Ms. Meyers's medical needs were not addressed by CCS staff – the most that can be said is that they were perhaps not properly diagnosed and treated. But that evidence points at most to negligence, not to deliberate indifference. *See Kosloski v. Dunlap*, 347 F. App'x 177, 180 (6th Cir. 2009) (nurse who failed to test for or treat inmate's undiagnosed endocarditis, even though she was informed by the inmate of the possibility that his symptoms might be related to that condition, was at most negligent where there was no evidence to support the conclusion that the nurse "appreciate[d] that a substantial risk of serious harm existed").

_____

[9] Plaintiff argues that the very fact of the four-day delay between June 28, 2013, when Ms. Meyers's kite was received to July 2, 2013, when she was seen by Nurse Jones, is sufficient evidence on which to draw an inference of deliberate indifference. But it is well established that "the mere existence of delay in receiving treatment is not enough for a jury to find deliberate indifference." *Santiago*, 734 F.3d at 593. Here, there is no evidence that any CCS staff was aware of any deterioration in Ms. Meyers's condition specifically between July 2, 2013 and July 7, 2013, and Plaintiff makes no effort at developing the argument that this four-day delay establishes deliberate indifference.

As Plaintiff's own expert observed, Nurse Jones, "through no fault of her own," did not appreciate the seriousness of Ms. Meyers's reports of back pain and no reasonable juror could conclude that Nurse Jones inferred a risk of substantial harm to Ms. Meyers and deliberately chose to ignore that risk. Plaintiff has failed to create a genuine issue of material fact that Nurse Jones was deliberately indifferent to Ms. Meyers's serious medical need. Nurse Jones is entitled to summary judgment.

## 2. Nurse (Creagh) Black

The same analysis applies with respect to Nurse Black. There is simply no evidence that she drew an inference that Ms. Meyers was at risk for substantial harm and consciously chose to ignore that risk. Nurse Black reviewed Nurse Jones's July 2, 2013 Note and found that Nurse Jones had complied with and followed the appropriate pathway and protocol. And again, Plaintiff lists a number of factors that Plaintiff believes supports a finding of deliberate indifference on the part of Nurse Black, followed by the following statement: "Each of these individual and cumulative failures by Director RN Creagh ("Black") and LPN Noland support a finding of CCS deliberate indifference. Defendant CCS failed to insure that its Director of Nursing was trained even in the most basic and rudimentary aspects of registered nurse duties – identifying abnormal vital signs and acting upon that information to provide 'urgent' medical care." (ECF No. 90, Pl.'s Resp. 19-20, PgID 2717-18.) This is a statement

attributing fault to CCS – not to the individual nurses.  And Plaintiff continues (under the heading of "deliberate indifference of Nurse Black") and states: "CCS failed to train its Director of Nursing in practices and procedures that would promote medical for a 'urgent' and serious medical condition."  (*Id.* at 20, PgID 2718.)  This is an allegation of a policy claim against CCS – not an individual deliberate indifference claim against Nurse Black.

Plaintiff has failed to create a genuine issue of material fact that Nurse Black was deliberately indifferent to Ms. Meyers's serious underlying medical condition and Nurse Black is entitled to summary judgment.

> **B.** **Plaintiff's *Monell* Claim Against Macomb County (and Against Sheriff Wickersham in his Official Capacity)**[10]

Plaintiff's theory of liability against the County appears to be that the conduct of DeHate and Hill is the result of the County's failure to train and the Sheriff's failure to establish policies as the policymaker for the jail and his post-hoc ratification of the officers' misconduct evidence by his failure to conduct a more robust investigation into Ms. Meyers's death.  The heart of the claim is that Sheriff Wickersham knew that his corrections officers lacked medical training to identify a serious medical need such as

---

[10] A claim against the Sheriff in his official capacity is treated as a claim against the County and the two are analyzed as one.  *Miller v. Calhoun*, 408 F.3d 803, 817 n. 3 (6th Cir. 2005)

acute sepsis and yet he knowingly tolerated that lack of training with the result that constitutional violations such as those allegedly committed by DeHate and Hill, resulting in Ms. Meyers's suffering and death, were a highly predictable consequence of that inadequate training. (Pl.'s County Resp. 10, PgID 3098.)

1. **Plaintiff's *Monell* claim is not necessarily foreclosed by the Court's finding that no individual Defendant is liable under § 1983.**

As a threshold matter, the County argues that because there has been no finding of a constitutional violation committed by a County employee, there can be no municipal liability on the part of the County. Defendants cite *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001) for the proposition that in the absence of a constitutional violation by an individual defendant, the municipality cannot be liable under § 1983. (ECF No. 96, Defs.' Reply PgID 3388.) But in *Winkler, supra*, the Sixth Circuit expressly rejected this narrow reading of *Watkins*, and opened the door to a theory of municipality liability in which no individual is found liable for an underlying constitutional violation:

> Winkler next focuses on the County's alleged liability. The district court found that the County could not be held liable under § 1983 because "there is no underlying unconstitutional conduct by any of the individual defendants in this case." But Winkler contends that if the County's policy, custom, or failure to train directly caused a violation of Hacker's constitutional right to adequate medical care, then the County may still be held liable even if no individual defendant is found to have committed a constitutional violation.

This court in *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001), stated that "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." Having already upheld summary judgment in favor of all of the individual defendants with regard to a constitutional claim of deliberate indifference to serious medical needs, the court then upheld summary judgment in favor of the municipal defendants with regard to a claim that they had failed to properly train the individual defendants. *Id*.

Despite the fact that *Watkins* broadly states that the imposition of municipal liability is contingent on a finding of individual liability under § 1983, other cases from this circuit have indicated that the principle might have a narrower application. Judge Cole, in a concurring opinion in *Epps v. Lauderdale County*, 45 F. App'x 332 (6th Cir. 2002), explained:

> When no constitutional harm has been inflicted upon a victim, damages may not be awarded against a municipality. But a finding that the individual government actor has not committed a constitutional violation does not require a finding that no constitutional harm has been inflicted upon the victim, nor that the municipality is not responsible for that constitutional harm. ... A given constitutional violation may be attributable to a municipality's acts alone and not to those of its employees—as when a government actor in good faith follows a faulty municipal policy. A municipality also may be liable even when the individual government actor is exonerated, including where municipal liability is based on the actions of individual government actors other than those who are named as parties. Moreover, it is possible that no one individual government actor may violate a victim's constitutional rights, but that the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.

*Id*. at 334–35 (internal citations and quotation marks omitted). *See also Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993)

(recognizing that "a municipality may not escape liability for a § 1983 violation merely because the officer who committed the violation is entitled to qualified immunity").

There is no indication that *Watkins* considered any of the situations discussed in *Epps* or *Garner* when it stated that municipal liability is contingent on a finding of individual liability. And the only case relied on by *Watkins* for that proposition, *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam), is not nearly so sweeping regarding the scope of Monell liability. *See id.* at 799, 106 S.Ct. 1571 ("[N]either *Monell* ... nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." (emphasis in original)).

In fact, several other circuits have considered *Heller* and concluded that a municipality may be held liable under § 1983 in certain cases where no individual liability is shown. *See e.g., Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury by the City, the fact that individual officers are exonerated is immaterial to [municipal] liability under § 1983." (emphasis in original)); *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002) ("The appropriate question under Heller is whether a verdict or decision exonerating the individual governmental actors can be harmonized with a concomitant verdict or decision imposing liability on the municipal entity. The outcome of the inquiry depends on the nature of the constitutional violation alleged, the theory of municipal liability asserted by the plaintiff, and the defenses set forth by the individual actors."); *Fagan v. City of Vineland*, 22 F.3d 1283, 1292, 1294 (3d Cir. 1994) (noting that "[i]f we conditioned municipal liability on an individual police officer's liability in every case, it might lead to illogical results," and holding that "a municipality can be liable under section 1983 and the Fourteenth Amendment for a failure to train its police officers with respect to high-speed automobile chases, even if no individual officer participating in the chase violated the Constitution").

*Winkler*, 893 F.3d at 899-901.

In *North, supra*, the Sixth Circuit gave further affirmation to *Winkler's* recognition that a municipality can be liable notwithstanding the absence of a constitutional violation by any individual officer:

> There must be a constitutional violation for a § 1983 claim against a municipality to succeed—if the plaintiff has suffered no constitutional injury, his *Monell* claim fails. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam). A court's finding that an individual defendant is not liable because of qualified immunity, however, does not necessarily foreclose municipal liability. *See Garner*, 8 F.3d at 365; *see also Richko v. Wayne County*, 819 F.3d 907, 920 (6th Cir. 2016) (rejecting the argument that a county cannot be held liable because the individual defendants are not liable as "unsound"). Whether and under what circumstances a municipality can be liable when the plaintiff suffered a constitutional violation but cannot attribute it to any individual defendant's unconstitutional conduct is a more complicated question—one that this court recently noted in *Winkler*, 893 F.3d at 899–900.

754 F. App'x at 389. The court in *North* then quotes at length from *Winkler*, concluding:

> In many cases, a finding that no individual defendant violated the plaintiff's constitutional rights will also mean that the plaintiff has suffered no constitutional violation. In a subset of § 1983 cases, however, the fact that no individual defendant committed a constitutional violation—e.g., acted with deliberate indifference to an inmate's serious medical need—might not necessarily "require a finding that no constitutional harm has been inflicted upon the victim, nor that the municipality is not responsible for that constitutional harm." *Epps*, 45 F. App'x at 334 (Cole, J., concurring).

The type of claim North advances—one premised on failure to act rather

than affirmative wrongdoing—might fit within this analysis. Assuming that our caselaw allows for such an approach, we consider his affirmative policy or custom and failure-to-train claims in turn.

754 F. App'x at 390. This Court will follow the Sixth Circuit's lead given that court's apparent willingness to entertain such a claim and will assume that Sixth Circuit "caselaw allows for such an approach." Thus, although the Court has concluded that Sheriff Wickersham (the only individual Defendant County Defendant named in this action) is not liable in his individual capacity, under this approach the Sheriff's conduct might still be evidence in support of a "failure to act" policy claim. Plaintiff also relies on the conduct of non-parties DeHate and Hill as evidence in support of such a policy claim against the County. "A municipality also may be liable even when the individual government actor is exonerated, including where municipal liability is based on the actions of individual government actors other than those who are named as parties." *Winkler*, 893 F.3d at 900 (quoting *Epps*, 45 F. App'x at 335.)[11]

---

[11] The Court will discuss the evidence related to Officers DeHate and Hill as relevant to the analysis of Plaintiff's claim against the County but makes no findings with regard to the deliberate indifference of either Officer DeHate or Hill. The Court notes, however, that Plaintiff's expert, Margo Frasier, expressly states in her opinions that Officers DeHate and Hill were unaware of the seriousness of Ms. Meyers's medical needs, casting great doubt on the Plaintiff's ability to establish the subjective awareness of these two officers:

A: (by Ms. Frasier) The evidence indicates that [Ms. Meyers] was suffering from a serious obviously not only life-threatening – it took her life – medical condition, that there were signs that she had some sort of

## 2. Plaintiff has failed to demonstrate a viable *Monell* claim against the County.

In a recent published opinion, *Jackson v. City of Cleveland*, __F.3d__, 2019 WL 1397484 (6th Cir. March 28, 2019) the Sixth Circuit outlined with great clarity what a plaintiff must prove in seeking to establish municipal liability. The relevant portions of that opinion bear repeating here at length:

---

> dire medical condition that was not attended to, and . . . it was not reported . . . and she was allowed to just kind of linger until the time she passed.
>
> Q: Okay. And who would that be attributable to?
>
> A: [W]e've already identified Deputy Franks, DeHate and Hill, and it's attributable I think – in my opinion it's due to lack of training and – and supervision, that these staff members either didn't know what to look at, for, or once they saw it didn't know what to do with it and didn't report it.

(ECF No. 96-2, June 25, 2018 Deposition of Margo L. Frasier 45, PgID 3438.)

Having affirmatively taken the position that the jail staff most likely responsible for the failure to address Ms. Meyers's urgent medical needs were "ignorant" of the import of Ms. Meyers's medical condition and "lack[ed] awareness of Ms. Meyers' symptoms of physical illness," and "fail[ed] to recognize and respond to [her] medical needs and to pass on medical concerns to jail nursing staff," *see* ECF No. 93, Pl.'s Resp. 22-23, PgID 3110-11, Plaintiff would be challenged in meeting the standard of proof required to establish deliberate indifference on the part of the individual jail staff, i.e. that they were subjectively aware of the gravity of Ms. Meyers's medical condition, that they drew the inference that she was in need of immediate medical attention, and despite that awareness they deliberately chose to ignore those needs and to allow Ms. Meyers to suffer and ultimately to die.

The cause of action created by § 1983 may be exercised only against a "person who ... causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Supreme Court has interpreted the word "person" broadly, and certain polities, including municipalities, are considered persons for purposes of § 1983 liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Although "person" has been given a wide meaning under § 1983, when the person is a municipality, liability attaches only under a narrow set of circumstances: "A municipality may not be held liable under § 1983 on a respondeat superior theory—in other words, 'solely because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. 2018). Instead, a plaintiff must show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). A plaintiff does this by showing that the municipality had a "policy or custom" that caused the violation of his rights. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

There are four methods of showing the municipality had such a policy or custom: the plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted)."

2019 WL 1397484, at * 22-23. Where, as here, the Plaintiff attempts to proceed on a

failure to train claim, the following must be shown:

In order to show that a municipality is liable for a failure to train its employees, a plaintiff "must establish that: 1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy

was closely related to or actually caused the injury." *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)).

*Id.* at *28. In order to demonstrate the second prong of a failure to train claim, i.e. that the inadequacy was the result of the municipality's deliberate indifference, the following evidence is required:

> A plaintiff may meet this standard by showing either (1) "prior instances of unconstitutional conduct demonstrating that the City had notice that the training was deficient and likely to cause injury but ignored it" or (2) "evidence of a single violation of federal rights, accompanied by a showing that the City had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2012) (citing *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)).

*Id.* at *30.

Here, as in *Winkler*, the record is undisputed that Plaintiff has no evidence of prior instances where inmates have received constitutionally inadequate medical care, either from CCS or from jail staff, and Plaintiff's expert expressly testified that Ms. Meyers was "the first" in a pattern that allegedly subsequently developed and that Plaintiff has no evidence of any such constitutional violations prior to the incident with Ms. Meyers, significantly narrowing the available theories for establishing "stand alone" liability here on the part of the County. Specifically, Plaintiff's expert witness concedes that prior to the incident involving Ms. Meyers, Plaintiff has submitted no evidence of a single prior instance when a prisoner's serious medical needs were

ignored by the jail staff:

> Q: So your opinion as to the county's policy, custom, or practice is based on Meyers' situation alone?

> A: For this particular case. We all know that there was a couple of cases afterwards, but Meyers was the first one of the trio.

> Q: Do you know of any other similar cases prior to Meyers' death.

> A: I do not.

> *          *          *

> Q: But prior to Meyers' death, do you know of any other instance, any other prisoner whose serious medical needs were ignored by jail staff, the uniformed jail staff?

> A: Other than Ms. Meyers, no, sir.

(ECF No. 96-2, Frasier Dep. PgID 3456, 3461.)

Without evidence of a single prior instance in which an inmate's medical condition was ignored – not to mention the specific condition of acute sepsis – Plaintiff here is in the same situation as the plaintiff in *Winkler* – having to establish that there was a failure of training that was so fundamentally flawed as to result in the predictable consequence of a constitutional violation. Here, as in *Winkler*, Plaintiff must establish that the training that the correctional officers receive was so constitutionally inadequate as to all but guarantee the resulting harm to Ms. Meyers – i.e. that she would suffer from an undiagnosed acute abscess and die. But, as in *Winkler*, Plaintiff has proffered

insufficient evidence on which a reasonable juror could conclude that the training corrections officers received was inadequate, let alone that an inadequacy resulted from deliberate indifference.

As an initial observation, it was not incumbent on the County to prove that their policies and procedures and training were adequate – it is Plaintiff's burden to demonstrate that they are *inadequate*. The Sixth Circuit explained this burden in *Harvey v. Campbell County Tenn.*, 453 F. App'x 557 (6th Cir. 2011):

> First, plaintiffs must come forward with evidence tending to show that Lowe's training was inadequate. Although defendants were not required to support their motion for summary judgment with evidence negating plaintiffs' claim, both individual defendants filed affidavits attesting to the adequacy of Lowe's training.
>
> *             *             *
>
> Plaintiffs have offered no evidence disputing these sworn statements and have not identified any particular deficiency in the training. . . . Plaintiffs' position is thus based not on evidence in the record that shows their cup is half-full, but on the failure of defendants to show conclusively that their cup is full to the brim. Plaintiffs would have us draw inferences that are not reasonably supported by the record evidence. As indicated above, our duty to view the facts in the light most favorable to plaintiffs does not require or permit us to accept as true mere allegations that are not supported by factual evidence. *Leary*, 528 F.3d at 443–44. Plaintiffs, in response to a properly supported motion for summary judgment, cannot rely merely on allegations and arguments, but must set out specific facts showing a genuine issue for trial. *Id*. at 444. Plaintiffs have not done so. They have presented no facts. In fact, it appears they have not even conducted discovery designed to uncover facts supporting their allegations. They rely instead on speculative, unsupported allegations to create metaphysical doubt, which clearly does not amount to a genuine

issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> The district court overlooked these shortcomings in plaintiffs' case, concluding that defendants had not met their burden. The court held that defendants had failed to conclusively show that Lowe's training was so adequate to the tasks performed as to demonstrate the absence of any genuine issue of material fact. In so ruling, the court did not identify a single item of evidence supporting plaintiffs' allegation that the training was inadequate. The district court thus improperly excused plaintiffs from their burden of coming forward with specific facts demonstrating a triable fact issue.

453 F. App'x at 565-66. The Sixth Circuit concluded:

> [I]t was manifestly not the defendants' duty to show that Deputy Lowe's training was adequate; it was plaintiffs' burden to show that such training was *inadequate*. Plaintiffs were obligated to come forward with affirmative evidence above and beyond the pleadings to show that the training Lowe received was not sufficient. But when defendants challenged plaintiffs to present their evidence of deficient training, plaintiffs' only response has been to argue essentially that defendants' affidavits are insufficient to rebut plaintiffs' unsupported allegations. This is not enough. For lack of evidence of inadequate training alone, defendants are entitled to summary judgment.

*Id.* at 566-67 (emphasis in original).

Here, although not required to do so, the County supported its motion with significant evidence that its corrections officer training program is robust and constitutionally sound. As Ms. Misch testified in her Affidavit, the Macomb County Corrections Officers receive extensive training in the first year of their employment and must attend at least 20 hours of additional training annually. Several of the

mandatory training modules pertain directly to safety and security of inmates: modules on Custody and Security, Prisoner Behavior, Suicide Awareness, Interpersonal Communication, and First Aid/CPR/AED are directed to training in the safety and well-being of inmates. The County also has provided Affidavit testimony of Ms. Sanborn, Ms. Darga, Ms. Misch, and Sheriff Wickersham, attesting to the fact that the Jail's policies and procedures met all MDOC and NCCHC standards. This testimony is unrebutted.

In response to this evidence, Plaintiff submits no evidence of past instances of failures to train and presents no evidence of higher or different training standards practiced elsewhere that should have been implemented by the County. Indeed many cases in this Circuit affirm that the training provided by the County, including CPR and First Aid training, is sufficient training for corrections officers to determine whether and when to escalate an inmate's complaint to healthcare. In *Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005), the corrections officers received what appears to have been the same 160 hours of training that DeHate and Hill received, including training in First Aid and CPR, and the Sixth Circuit concluded that the plaintiff's failure to submit any evidence tending to show this training was inadequate was fatal to her failure to train policy claim:

> Miller offers no evidence supporting her allegation that the County's failure to train amounted to deliberate indifference to the medical needs

of detainees at the Correctional Facility. Her argument pivots on Lindsay's admitted lack of emergency medical training, an argument that the District Court rejected. Lindsay testified at deposition that she had received 160 hours of training from the Department of Corrections that included instruction on handling certain medical situations, and that she was trained in first aid and CPR. Lindsay further testified that the Correctional Facility adhered to a medical policy whereby inmates were "initially checked by staff to find out what the problem is according to the inmate, and then that information is then relayed to the medical staff who handles the inmate's care from that point." To counter this evidence, Miller merely argues that a reasonable jury could find deliberate indifference on the part of the County. She offers no evidence beyond the facts of this case tending to show that the County's training and staffing policies were inadequate. There is no history of similar incidents at the Correctional Facility, nothing to show that the County was on notice, and nothing to show that the County's failure to take meliorative action was deliberate.

408 F.3d at 816. Nor can Plaintiff claim that the County's policy of contracting with CCS to provide medical care offends the Eighth Amendment. As the Sixth Circuit held in *Winkler*, "a municipality may constitutionally contract with a private medical company to provide healthcare services to inmates," and may rely on the medical judgments of those healthcare professionals. 893 F.3d at 901.

Here, in response to the County's motion, Plaintiff offers the Expert Report of Margo L. Frasier, J.D., C.P.O, who opines in part that there is evidence to suggest that the corrections officers of the Macomb County Sheriff's Office were inadequately trained or supervised. (ECF No. 93-25, Feb. 14, 2018 Expert Report of Margo L. Frasier p. 6, PgID 3301.) Importantly, of the 28 bullet points representing the specific

83

evidence on which Ms. Frasier relies in support of her opinions, *every one* of the 28

relates to facts that are specific to Ms. Meyers's incarceration and to the treatment she

received (or did not receive) over a period of eleven days of incarceration. *None* of the

evidence on which Ms. Frasier relies speaks to other incidents or failures in training

and she cites no specific policies or procedures that the County *should* have had in

place but did not. She identifies certain policies and opines that they "lack specificity"

but she does not identify what specifically the policies lacked or more importantly how

they failed to meet the governing standards identified by the County. Ms. Frasier's

opinion focuses solely on the circumstances of Ms. Meyers's death which cannot be

the sole basis for Plaintiff's municipal liability claim. This fatal flaw in Ms. Frasier's

opinion is evident in her summary opinion of the "policy, custom, or practice" that she

identifies as offending constitutional norms:

> At the time of the incident in question, Macomb County had a policy, custom, or practice of ignoring the serious medical or mental health needs and nutrition of its inmates. Particularly, the corrections officers and supervisors, along with the medical [sic] watched Meryers's physical and mental condition deteriorate over a period of eleven days and did not take any meaningful steps to provide her with adequate medical care. . . . There was a pattern of conduct over the eleven days that Meyers was held which have put a supervisor or policymaker on notice that additional training or supervision was needed.

Frasier Report 6-7, PgID 3301-02.

Here, as in *Miller*, Plaintiff "bases [his] argument entirely on the circumstances surrounding [Ms. Meyers's] death, but a single act may establish municipal liability only where . . . 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" 408 F.3d at 816-17 (quoting *Harris*, 489 U.S. at 390). As in *Winkler*, Plaintiff has failed to "identify what other medical training [it] believes that the jail personnel should have received. Nor does [Hubble] explain how the quality of the medical training provided put the County on notice of the likelihood that jail personnel would respond inadequately to an inmate's medical emergency." *Winkler*, 893 F.3d at 903. In fact here, Ms. Meyers was seen by healthcare, she was evaluated and treated and encouraged to kite again. "[I]t does not 'suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.'" *Id*. (quoting *Harris*, 489 U.S. at 391.)

In order to fit a claim within this "extremely narrow exception" that applies in the absence of a pattern of prior instances of unconstitutional conduct, a plaintiff must demonstrate that the training provided was so egregiously deficient that the officer "utterly lack[ed] an ability to cope with constitutional situations." *Shadrick v. Hopkins*

*County, Ky.*, 805 F.3d 724, 742 (6th Cir. 2015). Viewing the facts in the light most favorable to the Plaintiff, the evidence in this record regarding the training provided to the correctional officers at this jail, which mirrors the training found to be constitutionally adequate in other Sixth Circuit cases, simply does not bring this case, tragic as it may be, into "the narrow range of *Canton's* hypothesized single-incident liability." *Shadrick,* 805 F.3d at 742 (internal quotation marks and citation omitted). The conclusory opinions of Ms. Frasier are not sufficient to create a genuine issue of material fact, as the Sixth Circuit observed in *Winkler*:

> The opinion of Winkler's medical expert that Healthcare's training program was inadequate is not, by itself, sufficient to show deliberate indifference because Winkler has neither provided evidence of past examples of constitutionally inadequate treatment of inmates by Healthcare's medical staff nor explained how the training program's alleged weaknesses were so obvious as to put Healthcare on notice that a constitutional violation was likely. *See Ellis*, 455 F.3d at 700–01 (explaining the two ways that a plaintiff can show that inadequate training reflects deliberate indifference).

893 F.3d at 904. "Because [Hubble] has failed to demonstrate that the Correctional Facility policies were objectively inadequate, much less that the County was deliberately indifferent to the obvious inadequacy of those policies," Plaintiff cannot sustain a claim against the County for failure to train. *Miller*, 408 F.3d at 817.[12]

_____

[12] Plaintiff also adverts to, but does not adequately develop, a claim against Sheriff Wickersham in his official capacity as a "policymaker," or for failing to investigate/ratification. (Pl.'s Resp. 20, 22-24, PgID 3108, 3111-12.) Plaintiff's

## C. Plaintiff has failed to demonstrate a viable *Monell* claim against CCS.

"[P]rivate corporations performing traditional state functions, such as the provision of medical services to prison inmates, act under color of state law for purposes of § 1983." *Shadrick*, 805 F.3d at 736 (citing *Rouster v. City of Saginaw*, 749 F.3d 437, 453 (6th cir. 2014)).[13] "The 'deliberate indifference' standard of the Eighth

---

briefing on this claim (or cluster of claims) is very confusing and blurs the lines between the various available theories of municipal liability. It is unclear whether Plaintiff is attempting to assert a "policymaker" or "ratification" claim separate and apart from the failure to train claim (which appears to be the heart of Plaintiff's *Monell* claim against the County) but if so, such a claim fails. A plaintiff asserting a "single-act policymaker" claim "must demonstrate that a "deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question." *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). "Moreover, that course of action must be shown to be the moving force behind or cause of the plaintiff's harm." *Id*. Here, Plaintiff does not submit evidence (or even develop a coherent argument) that Sheriff Wickersham made a "choice" among alternatives that resulted in the harm to the Plaintiff. Nor can any alleged "after-the-fact approval of the investigation, which did not itself cause or continue a harm against [Meyers] [] sufficient to establish the *Monell* claim." *Id*. It is undisputed that there was an investigation into Ms. Meyers's death and there was no evidence presented of previous failures to investigate. Any claim based on a failure to investigate would require evidence that the County had failed to investigate some number of prior incidents. *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989) (finding municipal policy of deliberate indifference where sheriff was aware of 14 previous instances of mistreatment of paraplegics and had failed to investigate or discipline).

[13] The same discussion regarding the *Winkler* case, and the Sixth Circuit's position on whether there can be a claim against the municipal entity in the absence of a finding of an underlying constitutional violation by an individual, is equally relevant here. There is some question whether such a claim can survive. Even though the Sixth

Amendment governs [CCS's] responsibility for training and supervising its [] nurses concerning their legal duty to honor an inmate's constitutional right to adequate medical care. [CCS's] failure to train and supervise its [] nurses adequately 'about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983,' and constitute the moving force behind [Meyers's] harm." *Shadrick*, 805 F.3d 737 (quoting *Connick v. Thompson*, 563 U.S. 51 (2011)). "[Plaintiff's] burden under § 1983 is to prove that [CCS's] failure to train and supervise its [] nurses about the legal duty to provide constitutionally adequate medical care amounted 'to deliberate indifference to the rights of persons with whom the [nurses] come into contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (final alteration in original)). "The law does not permit [Plaintiff] to hold [CCS] liable under § 1983 on theories of vicarious liability or respondeat superior." *Id.*

---

Circuit has suggested that such a claim *might* survive, it has never actually so held. And it has clearly suggested the opposite. For example in *Rouster*, after concluding that none of the individual nursing staff had been deliberately indifferent, the Sixth Circuit declined even to analyze Plaintiff's failure to train claim, concluding: "As discussed above, *Rouster* is unable to prove that Jerry's constitutional rights were violated. Therefore, we need not consider whether Secure Care's staffing or training policies might have caused such a violation." 749 F.3d at 453-54. Assuming, however, as we did with the County Defendants, that such a claim can survive in this Circuit, we proceed to analyze the claim that Plaintiff asserts.

Plaintiff asserts that "CCS tolerated a policy of inadequate training, as evidenced by the consistent and pervasive failed inaction of LPN Jones and Director of Nursing RN Creagh ("Black"), and by unnamed and unidentified CCS staff." (ECF No. 90, Pl.'s Resp. 22, PgID 2720.) But as with its claim against the County Defendants, Plaintiff supplies no evidence of prior instances (apart from Ms. Meyers) in which CCS has provided inadequate medical care that resulted in the death of an inmate from sepsis – indeed Plaintiff provides no evidence at all regarding prior of instances of an inmate death resulting from inadequate training of the CCS nursing staff. Thus, as with its claim against County Defendants, Plaintiff must fit its claim within that "'narrow range of circumstances' where a federal rights violation may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Shadrick*, 805 F.3d at 739 (quoting *Bd. of Cnty. Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 409 (1997)). In *Shadrick*, the Sixth Circuit found facts that did fit within that "narrow range of circumstances," where the evidence revealed that the health care provider "did not have a training program," for its LPN nurses:

> There is no indication in the record before us that [the prison health care provider] designed and implemented any type of ongoing training program for its LPN nurses. While the nurses may have received some limited on-the-job training when beginning their employment, such as learning where supplies were kept, there is no proof of a training program that was designed to guide LPN nurses in assessing and documenting

medical conditions of inmates, obtaining physician orders, providing ordered treatments to inmates, monitoring patient progress, or providing necessary emergency care to inmates within the jail environment in order to avoid constitutional violations.

LPN nurses complete a level of medical training, they obtain a Kentucky license, and they arrive on the job with a limited set of medical skills. This § 1983 claim does not turn, as the dissent says, on whether the nurses know how to make "rudimentary medical judgments" about inmates' symptoms or whether they know when to call the doctor. Dissent at 754. Shadrick's expert witness established that LPN nurses lack any authority to diagnose medical conditions, yet the nurses are routinely confronted with frequent and competing demands for medical care arising from the needs of numerous inmates suffering from maladies of varying severity. It is predictable that placing an LPN nurse lacking the specific tools to handle the situations she will inevitably confront in the jail setting will lead to violation of the constitutional rights of inmates. A reasonable jury, therefore, could determine that SHP's failure to train and supervise its LPN nurses in meeting their constitutional obligations demonstrates SHP's own deliberate indifference to the highly predictable consequence that an LPN nurse will commit a constitutional violation. *See Bryan Cnty.*, 520 U.S. at 409, 117 S.Ct. 1382. A jury could find that "the unconstitutional consequences of failing to train" are "so patently obvious" that SHP should be held "liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 131 S.Ct. at 1361. Even the dissent acknowledges that *City of Canton* applies if "the need is so patent as to be self-evident." Dissent at 755.

805 F.3d at 739-40. The Sixth Circuit found such patent obviousness because the evidence demonstrated an "utter lack" of any training at all:

Because it is so highly predictable that a poorly trained LPN nurse working in the jail setting "utter [ly] lack[s] an ability to cope with constitutional situations," *id.* at 1363, a jury reasonably could find that SHP's failure to train reflects "deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights," *id*. at 1361 (quoting *Bryan Cnty.*, 520 U.S. at 409, 117 S.Ct. 1382). Unlike

*Connick* and *D'Ambrosio*, this case falls squarely within "the narrow range of *Canton's* hypothesized single-incident liability." *Connick*, 131 S.Ct. at 1361.

805 F.3d at 742.

Our facts differ greatly from *Shadrick* and dictate a different result. To begin with, the evidence in *Shadrick* revealed that the nurses *knew* that the inmate (25-year old Taylor Butler) had an active Methicillin-resistant Staphylococcus aureus ("MRSA") infection, and *directly observed* that he was vomiting, sweating profusely, and had difficulty standing up. 805 F.3d at 729. He specifically informed the jail intake staff that he had a MRSA infection, and was under a doctor's care for high blood pressure, rheumatoid arthritis, gout, and osteoporosis. He listed several medications he was taking, and denied drug or alcohol addiction. *Id*. Jail staff did not want to admit Butler due to his presentation and condition, and deferred to medical staff who were the only ones under jail policy who could refuse admission of an inmate for health reasons. *Id*. Jail staff called LPN Candace Moss to the booking area to examine Butler to determine whether the jail could refuse to admit him. Butler told Moss that he had frequent staph infections, that he was suffering from a staph infection in his groin area that his doctor had not yet examined, and that he had been vomiting, which he attributed to the staph infection. *Id*. A jail deputy watched Butler as he spoke with Moss and noticed that his skin was clammy and gray in color, that he was bloated, that

he had open wounds on his legs, and he exposed the staph infection in his groin and said "I have staph infection all over me . . . it's in my groin . . . . I don't need to be here." *Id*. at 740. Moss admitted Butler anyway, put him on 72-hour watch for detoxification, and did not institute the jail's written policy guidelines for the treatment of staph and MRSA infections, which are known to progress rapidly and to require constant monitoring and precautions to prevent the spread of the infection. *Id*. at 731. Over the next two days, Butler asked for a sick-call slip which he was provided by a deputy who tried to persuade the SHP nurse on duty to see Butler that day, which jail records reflect never occurred. Butler was unable to get up off of the floor of the cell to receive his medications, he defecated on himself and was cleaned up and returned to his cell. Deputies walked to the medical office to inform the nursing staff of Butler's condition, and nursing staff said that they were aware of Butler's condition and seemed unconcerned. When Butler defecated on himself again, he was moved to a segregation cell for observation, at which time nursing staff did not take any vital signs, examine Butler, or provide him with any medication. On the third full day of his incarceration, Butler was found unresponsive lying awkwardly in his cell by nursing staff who did not begin CPR but rather paged the on-call doctor (who did not respond) and called EMS. Butler was pronounced dead shortly thereafter. *Id*. at 732-33.

Each of the LPNs who were involved in Butler's care testified to an utter lack of training on SHP's policies and procedures. The LPNs testified that they did not know whether they were required to take vital signs of an inmate with Butler's symptoms, that no one from SHP supervised or critiqued the LPNs work or reviewed the LPN's medical progress notes, and none of them appeared to understand the necessity of enforcing the policies and procedures with regard to staph and MRSA infections. They testified that if an inmate with a staph infection did not put in a sick call request, they would go untreated and if they didn't ask for help within a few days, they would be put on suicide watch because if they don't seek help for such conditions, they must be suicidal. *Id*. at 734.

The facts of *Shadrick* continue in this way, detailing a lack of appreciation on the part of the LPNs for inmate health and safety of a gross magnitude, very much different from the facts of this case. In *Shadrick*, the Sixth Circuit found that the LPN nurses working at the jail had a "blanket inability . . . to identify and discuss the requirements" of the written policies governing their work. 805 F.3d at 740. "The nurses professed ignorance of the written medical treatment protocols and policies purportedly drafted by SHP to guide their conduct." *Id*. No such facts have been established in this case – in fact just the opposite. Nurse Jones was able to discuss in detail the medical pathway that she followed in assessing Ms. Meyers and she was able

to explain how she arrived at the intervention of "alteration in comfort – nonspecific." Nurse Jones may have been wrong in failing to appreciate the significance of Ms. Meyers's "abnormal" normal vitals, but she was well aware of the policies that she employed that guided her to the conclusion she reached. Also in *Shadrick* the on-site nursing manager "was not familiar with the SHP policies she was specifically designated to enforce," and "SHP nurses followed an undocumented policy and custom of providing medical assistance only if an inmate asked for it . . . ." 805 F.3d at 740-41. No such evidence has been presented in this case. In fact Nurse Black, who was very well versed in the SOAP pathways and protocols that nurses at the jail were required to utilize, testified that when she was appointed to the Director of Nursing position, CCS sent a representative to conduct a one-on-one training to educate her on CCS's policies and protocols. Nurse Black testified that she was constantly evaluating whether the nursing staff was complying with those policies and procedures and bringing them back into compliance if she learns of an instance where they have failed to follow protocol. Further distinguishing *Shadrick*, the Sixth Circuit found in that case that the LPNs were expected to define on their own the scope of their practice – in this case the SOAP pathways and protocols direct the LPNs in a multitude of appropriate directions based upon objective clinical findings. And the LPNs assessments are reviewed, as they were in the case of Ms. Meyers, in a timely fashion

by an RN, in this case Nurse Black, who reviews the LPN assessments for completeness and thoroughness.

Here, Defendants produced evidence through their nursing expert, Kathryn Wild, explaining the adequacy CCS policies and procedures. (ECF No. 77-11, Report and Supplemental Report of Kathryn J. Wild.) Plaintiffs apparently never deposed Ms. Wild regarding her opinions and have failed to produce evidence calling into question her opinion that these policies and procedures are compliant with all applicable legal standards, that they are adequate in every way, and that CCS nursing staff followed these policies procedures in their treatment of Ms. Meyers. *See Shadrick*, 805 F.3d at 741. In her Report, Nurse Wild discusses in detail the governing CCS policies and procedures:

> **CCS Policy and Procedure, No. J-E-02 – "Receiving Screening"** states that a receiving screening (Form CCS-IN01 available in English or Spanish) is performed on inmates within 8 hours of arrival at the facility in order to identify health conditions requiring immediate or ongoing interventions including separation from the rest of the population because of dangerous communicable diseases and active substance withdrawal.
>
> The medical screening completed on Ms. Meyers upon admission to the Macomb County Jail by CCS nursing personnel complied with these standards and they reasonably questioned this patient regarding her current and continuing healthcare needs. At the time of this screening, Ms. Meyers presented as alert and oriented, and denied using any illegal substance within a month of her booking. Her vital signs and presentation did not suggest any need to place this patient on withdrawal monitoring, as 30 days since last use would not have been a red flag for detoxification monitoring. Ms. Meyers was appropriately referred for chronic care clinic

and mental health assessment as required by the standards.

Health care personnel must rely on the patient to report accurate information during this screening process to appropriately ensure continuity of care. There was nothing in this patient's presentation, or prior incarceration history that would have resulted in any referrals other than those made by the screening nurse.

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-A-01 – "Access to Care"** states that inmates have access to care to meet their serious medical, dental and mental health needs.

**CCS Policy and Procedure, No. J-E-11 – "Clinical Pathways"** states that CCS has established clinical pathways to guide the care provided by nursing personnel. The CCS Chief Medical Officer is responsible for reviewing the clinical pathways annually and revising, as necessary. Approved pathways are dated and signed by the Medical Director. Nursing personnel receive training on the use of the clinical pathways. The pathways are appropriate for the level of skill and preparation of medical personnel who will carry it out. Each pathway is in compliance with the standards of practice for their level of care.

Clinical Pathways do not include any prescription medication used, with the exception of those covering emergency or life-threatening situations. Treatment with prescription medication is only initiated upon a written or verbal order from a practitioner licensed to practice in the State of Michigan.

During Ms. Meyers incarceration with the Macomb County Jail, and while under the care of Correct Care Solutions health personnel, she had access to care for her medical, dental and mental health needs. She was triaged upon arrival to the facility and appropriate referrals were made to ensure continuity for her known history of Hepatitis C and Bipolar Disorder. This patient also submitted a written sick call request and was seen by nursing personnel and evaluated utilizing appropriate nursing clinical pathways for her stated complaint and physical presentation.

On **July 2, 2015** Nurse Noland saw Ms. Meyers for her complaint of pain in the lumbar area. She inspected her back area and found no abnormalities that suggested anything other than a nonspecific alteration in comfort. She provided Ms. Meyers with Tylenol 975 mg twice daily for 2 days so that Ms. Meyers could address her symptoms as needed (prn) even through her examination elicited no findings other than the patient's complaint and minimal swelling in the area. This Tylenol order appears to have been Nurse Noland's attempt to help Ms. Meyers deal with her discomfort, not an indication that she was in any serious pain.

This intervention was well within the standard of care and clearly did not demonstrate a deliberate indifference to Ms. Meyers medical condition much less a reckless/intentional disregard of a serious medical condition of which she knew or should have known.

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-E-08 – "Emergency Services"** states that the facility provides 24-hour emergency medical, mental health, and dental services. CCS Policy and Procedure, No. J-E-08 – "Emergency Services" states that emergency medical, mental health and dental services are provided 24 hours per day. A CCS staff member will respond to all emergencies upon notification. An emergency on-call schedule is maintained in the health clinic.

Nursing staff respond by reporting to the area of the emergency with necessary emergency equipment and supplies. Emergency equipment and supplies are regularly maintained and accessible to health staff. The inmate will be stabilized on-site and then transferred to an appropriate health care unit if necessary.

Notification of on-call physicians and mental health staff will be accomplished as soon as the situation allows. After hours notification is accomplished by cell phone.

The health care provider or designee will determine if the inmate needs to be transported to local emergency room for treatment. Command staff will ensure request for an ambulance has been accomplished.

On **Sunday, July 7, 2013** at 1638 hours, when nursing staff responded to the call for emergency assistance they responded immediately and appropriately. They provided lifesaving measures until emergency personnel arrived and assumed care.

In her Supplemental Report, specifically responding to Plaintiff's expert Dr. Vassallo, Nurse Wild explains that Nurse Jones was not working outside her scope of practice as an LPN when treating Ms. Meyers based upon provisions of the Michigan Public Health Code that expressly permit an LPN to perform such assessments under the supervision of an RN. Nurse Wild explains in her supplemental Report:

Plaintiff's Expert Dr. Susi Vassallo opines in her report (page 4) that LPN Jones (Nolan) worked outside her scope when she saw Ms. Meyers at sick call on July 2, 2013 and attempted to diagnose her serious medical condition. I disagree with this opinion for the following reasons:

The Michigan Public Health Code, Public Act 368 of 1978: The practice of nursing includes the care/treatment and counsel/teaching of patients who (1) are experiencing changes in the normal health processes or (2) require assistance in the maintenance of health and the prevention or management of illness, injury, or disability. A registered professional nurse (RN) is an individual (1) who is licensed to engage in the practice of nursing and (2) whose scope of practice includes the teaching, direction, and supervision of less skilled co-workers who perform nursing activities. An RN may perform under the supervision of a physician or dentist, and a physician may delegate in writing to an RN the ordering, receipt, and dispensing of medicines other than certain controlled substances.

A licensed practical nurse (LPN) is a person who practices nursing, but who has less comprehensive education and skills than an RN. An LPN may perform only under the supervision of an RN, physician, or dentist. The practice of a licensed practical nurse is a health professional subfield of the practice of nursing; as such, LPNs may not delegate tasks to or

supervise other licensed or non-licensed health professionals.

> Section R333.16109 defines "Supervision" as the overseeing of or participation in the work of another individual by a health professional licensed under this article in circumstances where at least all of the following conditions exist: a) The continuous availability of direct communication in person or by radio, telephone, or telecommunication between the supervised individual and a licensed health professional. b) The availability of a licensed health professional on a regularly scheduled basis to review the practice of the supervised individual, to provide consultation to the supervised individual, to review records, and to further educate the supervised individual in the performance of the individual's functions. c) The provision by the licensed supervising health professional of predetermined procedures and drug protocol. LPN Jones (Nolan) did not attempt to provide a medical diagnosis of her patient. When LPN Jones (Nolan) saw Ms. Meyers at sick call on July 2, 2013, she was appropriately working under the physician authorized protocol in place for patient complaints of muscular aches. The following morning, the supervising registered nurse reviewed Nurse Jones (Nolan's) evaluation of Ms. Meyers. Nurse Jones (Nolan) was working well within her scope of practice as a Licensed Practical Nurse in the State of Michigan.

(ECF No. 11-7, PgID 1889-90.) When informed that, under Michigan's Public Health Code, an LPN may perform nursing activities under the supervision of a registered nurse or a physician, Dr. Vassallo withdrew her opinion that Nurse Jones was not qualified to evaluate Ms. Meyers. (Vassallo Dep. at 110-12, PgID 1922.)

Several Sixth Circuit cases have distinguished *Shadrick*, and reiterated the very narrow set of facts that will fit within the single incident theory of municipal liability.

For example in *Winkler* the detainee,[14] who died in custody five days after his admission to the jail from an undiagnosed duodenal ulcer, also was cared for by an LPN (Nurse Johnson) who worked at the jail under the supervision (largely by telephone) of an RN and an on-call doctor. 893 F.3d at 885. The plaintiff claimed that Nurse Johnson exhibited deliberate indifference to Winkler when she saw him in response to his first sick call request. *Id*. at 894. Specifically, plaintiff asserted that Nurse Johnson "failed to follow various opiate-withdrawal and abdominal discomfort protocols in place at the time." *Id*. The Sixth Circuit, first addressing the individual capacity claim against Nurse Johnson, concluded that while Nurse Johnson's actions may have fallen below the standard of care, and she may have failed to follow internal policies, she appropriately gathered information about the inmate's condition and shared it with a medical professional, and did not exhibit deliberate indifference to his medical needs. *Id*. Turning to the municipal liability claim against the jail's private healthcare provider ("Healthcare"), the Sixth Circuit concluded that the testimony of plaintiff's medical expert that the training provided to Nurse Johnson was inadequate,

---

[14] At the time *Winkler* was issued, pretrial detainees's Fourteenth Amendment claims of inadequate medical care were still analyzed under the same subjective intent deliberate indifference standard applied to convicted prisoners under the Eighth Amendment. As the Sixth Circuit has recognized however, there is a body of precedent building in other circuits that applies an objective deliberate indifference standard in the case of denials of medical care to pre-trial detainees. *See Richmond v. Huq*, 885 F.3d 928, n. 3 (6th Cir. 2018).

as allegedly demonstrated by her ignorance of and failure to follow internal policies, was insufficient to create a genuine issue of material fact on the issue of Healthcare's deliberate indifference. *Id*. at 904-05. Distinguishing *Shadrick*, the Sixth Circuit reasoned:

> [D]espite Winkler's argument to the contrary, the facts of this case are easily distinguishable from those of *Shadrick v. Hopkins County*, 805 F.3d 724 (6th Cir. 2015). The evidence in *Shadrick* revealed that the jail's private healthcare provider did not have a training program for its LPN nurses beyond very limited on-the-job training concerning issues like where supplies were kept. *Id*. at 740 (noting that the LPN nurses received no feedback, regular evaluations, or ongoing training about their medical responsibilities in the jail setting, and that two high-level supervisors disclaimed any responsibility for training and supervising the LPN nurses). According to *Shadrick*, there is an "obvious need to train LPN nurses who lack knowledge about the constitutional dimensions of providing adequate medical care to inmates in the jail setting." *Id*. at 742. The court therefore concluded that "[t]he lack of evidence that [the private healthcare provider] trained and supervised its nurses in their constitutional obligations to provide medical care could lead a reasonable jury to find that [the private healthcare provider] was deliberately indifferent to the inmates with whom the nurses came into contact." *Id*. at 744.
>
> Here, there is evidence showing that Healthcare provided training to all of its medical staff concerning the civil rights of inmates, including the right to adequate medical care. This training included an initial one-on-one training session and ongoing group sessions several times a year, as well as specific training on how to provide healthcare to a subgroup of individuals with addictions. Because Winkler has not provided any contrary evidence or otherwise explained how Healthcare's training program was inadequate, the record would not support a jury finding that Healthcare exhibited deliberate indifference toward inmates at the Detention Center by failing to adequately train its medical staff. *See Miller v. Calhoun County*, 408 F.3d 803, 816 (6th Cir. 2005) ("Mere

allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability.").

893 F.3d at 904-05.

The Sixth Circuit also distinguished *Shadrick* in *North*, *supra*, finding adequate training and supervision of the healthcare LPNs:

> Although some of the factors relevant in *Shadrick* are present here, there are also some important differences. In addition to LPNs, the jail employed nurses and medical providers with more advanced training and certifications (e.g., registered nurses (RNs), nurse practitioners (Nps), and physicians) to treat inmates. . . . There is no evidence that nurses were permitted to use the policies at their discretion or to define the scope of their practice and no indication that nurses or providers refused to provide care unless an inmate requested it. In sum, the County's training program is not so inadequate that failing to provide additional training constitutes deliberate indifference to an obvious risk of injury.

*North*, 754 F. App'x at 393-94. *See also Bays v. Montmorency, County*, No. 15-10534, 2017 WL 242841, at *1-2 (E.D. Mich. Jan. 20, 2017) (distinguishing *Shadrick* where nurses demonstrated familiarity with the policies and procedures governing their work and there was no evidence "of an undocumented custom of providing medical assistance only if requested, in violation of the written policies," as there was in *Shadrick*).

The facts surrounding CCS's treatment of Ms. Meyers align with *Winkler*, *North*, and *Bays*, and not with *Shadrick*. The evidence of the significant training and oversight provided by CCS, as well as Nurse Jones's and Black's complete awareness

and understanding of the policies and procedures they were required to follow, is extensive and unrebutted. Plaintiff's own expert, Dr. Vassallo, withdrew her opinion that Nurse Jones was acting outside her scope of practice once Dr. Vassallo was confronted with Nurse Wild's testimony regarding the provisions of Michigan Public Health Code which demonstrate the falsity of that opinion. Nurse Jones may have lacked the knowledge and training that would have enabled her to connect Ms. Meyers's history of IV drug abuse and her back pain to arrive at a suspicion of some type of life-threatening infection. But the Constitution, as interpreted in numerous Sixth Circuit opinions discussed *supra*, does not demand that Nurse Jones possess that level of knowledge or training in order to provide adequate healthcare to the inmates she treats. Ms. Meyers' death was a tragedy – and perhaps preventable with earlier detection of her underlying condition. But no reasonable jury could conclude that fault under § 1983 lies with CCS or its staff, none of whom were deliberately indifferent to Ms. Meyers's medical needs.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Macomb County Defendants' Motion for Summary Judgment (ECF No. 82), GRANTS the CCS Defendants' Motion for Summary Judgment (ECF No. 77), DENIES Plaintiff's Motion for Sanctions (ECF

No. 102),[15] and DISMISSES Plaintiff's Complaint WITH PREJUDICE.

IT IS SO ORDERED.


                                        s/Paul D. Borman
                                        PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

Dated:  April 23, 2019

---

[15] Plaintiff filed a Motion for Sanctions seeking spoliation sanctions in the form of an adverse inference jury instruction that the illegible portion of the single sick call request in the record, the portion that allows the inmate to describe their symptoms in more detail, "would support Plaintiff's deliberate indifference claim against [the CCS Defendants] for deliberate indifference in failing to ask for a higher level of care from a nurse or doctor."  (ECF No. 102, Motion for Sanctions 9-10, PgID 3756-57.) First of all, CCS *did* retain the sick call request.  And Plaintiff proffers no evidence that CCS played any part in whatever processes resulted in a portion of the sick call slip being illegible, nor that CCS acted with the requisite culpable state of mind.  Accordingly, the Motion for Sanctions is DENIED.